## 36285. HIGHFIELD v. THE STATE.

MARSHALL, Justice.

The defendant appeals from his convictions of murder and hindering the apprehension of a criminal, for which he received consecutive sentences of life and five years' imprisonment, respectively.

1. Enumerated errors 5, 6 and 14 raise the issue of the sufficiency of the evidence to authorize the convictions.

Evidence was adduced to the following effect. On the afternoon and night of May 8, 1979, Keith Fair, Becky Nation, Sherill Land, Dexter Thomas, "Beetle" Turner, and Jackie Morris were drinking together at the home of Thomas in Habersham County. Fair, Turner, Thomas and Morris all left Thomas' house together, then Fair, Thomas and Morris returned later without Turner.

According to Thomas, after leaving his (Thomas') house, Fair shot Turner while the latter sat in Morris' car in Habersham County. The reason he gave for the shooting was Turner's failure to pay Fair for his assistance to Turner in setting fire to a trailer belonging to Morgan Whitlock, upon whom Turner had sworn vengeance. Thomas testified that he was present when Fair shot and killed Turner, placed the body in Turner's truck, and drove the truck into a river. Though Nation and Land were not present at the shooting, they did witness the truck being driven into the river by Fair in an attempt to conceal the murder of Turner, and Nation testified that she and Fair talked about the murder when he returned.

Fair wanted to burn Morris' blood-soaked car, so, after disposing of Turner's truck and body, all of the aforementioned persons agreed to meet at the Huddle House. Morris, Thomas, and Land rode together in one car, while Fair and Nation rode in a

separate car. Fair and Nation went to the appellant's trailer to ask him to drive them in his Volkswagen car (which was quieter than Fair's car) to the Huddle House. The three of them rode in the appellant's car, with the appellant driving, to the Huddle House, thence to a road near Lula, where they met Morris, Thomas, and Land, who were still in Morris' blood-soaked car. During that ride, Nation (who was in the back seat, not known to the appellant and Fair to be awake) heard Fair tell the appellant that he, Fair, would have to get rid of Morris, because the latter had been a rat in prison. After this, the appellant asked Fair, what about Nation, to which Fair replied that she would be "all right." After arriving at the intended scene of Morris' murder in Hall County, Fair parked the appellant's car, which he had been driving apparently from the Huddle House, got out, and went over to Morris' car, where Morris and Land were standing. After Fair told Morris that they would burn his whole car, rather than just the back seat, Morris stated that he wanted his tires removed so that he could recover the insurance money by claiming that the car had been stolen and stripped. At this point, Thomas got into the appellant's car with the appellant and Nation, and the appellant told Thomas that Fair had told the appellant that he was going to kill the appellant and Land, too. According to Land, Morris did not want his whole car burned. As Morris stooped down beside a tire to begin removing it, Fair shot him in the side of the head and face. (Fair and Thomas were both convicted in Hall Superior Court of the murder of Morris, Fair's conviction having been upheld by this court. *Fair v. State,* 245 Ga. 868 (268 SE2d 316) (1980)). Thomas heard the three gunshots, but did not witness the actual shooting. Thomas testified that the appellant looked surprised when the shots were heard. Nation had passed out, drunk, in the back seat of the appellant's car, having been drinking with Fair since early that morning.

Following the shooting, Land got into the appellant's car while Thomas helped Fair put Morris' body into Morris' own car. Land testified that the appellant told her that Fair trusted her and Thomas, and that "you all better not let him down." Fair attempted to get gas from the victim's car by beating, then shooting a hole in, the gas tank. Fair then got into the appellant's car and told the occupants that "this can go both ways," which the witness, Land, construed to mean that Fair was going to kill them also. Land heard Fair say that Morris had been an "SOB on the chain gang." The appellant drove Land and Thomas home, then took Fair and Nation to his trailer home.

Morris' burned car and body were found on June 9. A bumper jack was found under the car, and a bullet was recovered from the gas

tank. The next day, Turner's body was found in his submerged truck. It was stipulated that the bullets recovered from the two victims (which caused their deaths) and the gas tank had been fired from the same gun.

The appellant's in-custody statements, admitted in evidence following a *Jackson v. Denno* hearing, were to the following effect: that Fair came to the appellant's trailer around 12:30 (on the night of the murders) with blood on his pants and a pistol protruding from his pocket, and asked the appellant to drive him and Nation to the Huddle House; that the appellant had asked Fair if he had been cut or stabbed, to which Fair said that he had not; that Fair had said that he had been in trouble and that he intended to burn Morris' car because there was blood from Turner's murder all over the back seat;[1] that the appellant then drove Fair and Nation to the restaurant, but Thomas, Morris and Land had left; that they then drove toward Lula, where they found Thomas, Morris and Land; that, after reaching the murder scene, Fair argued with Morris about burning Morris' car; that Fair shot Morris, and Thomas helped Fair put the body in Morris' car; that, through his rearview mirror while sitting in the driver's seat, the appellant saw Thomas making motions with his arms as though he were cutting Morris' throat; that Thomas and Fair had then gotten in the appellant's car, and they all drove away; that Thomas threw out of the car his knife, shoes and shirt, saying that this was the second pair of shoes he had had to throw away that night; that Thomas had said that Morris had tough skin to cut; that Fair had thrown his pistol (which was never recovered) out the car window as they drove over a bridge in Lula; that the appellant drove Fair to the appellant's trailer, where Fair took a bath; and that the appellant took the front tires off his VW and burned them, as Fair had told him to do.

Fair, a main defense witness for the appellant, invoked the Fifth Amendment in response to most of the questioning, but testified that, although he had asked the appellant to drive him to the Huddle House and toward Lula, the appellant had nothing to do with the Morris murder. Martha Evans, a friend of the appellant's, testified that Becky Nation (who had been passed out, drunk, during much of the incident in question) had told her that the appellant had not been involved in the murder. Haskell Ransom, a cellmate of Thomas, testified that Thomas had told him that the appellant had sat in his

---

[1] In the first of the appellant's statements he said that Fair revealed to him the purpose of the late night trip *before* they reached the Huddle House; in the second he said it was *afterwards* .

car during the entire episode of Morris' murder.

The appellant's testimony was basically the same as the contents of his statements, although he denied having told Detective Attaway that he had seen Thomas cut Morris' throat. He claimed no participation in the Morris murder and no knowledge about Turner's earlier murder. He stated that he had not immediately driven away from the murder scene because of his fear of Fair after the murder.

Thus, there was evidence to the following effect. In the middle of the night, Fair, whom the appellant knew, came to the appellant's residence, with blood (which Fair told him was not his own) on his pants and a pistol protruding from his pocket. Fair asked the appellant to drive him somewhere (ostensibly to a restaurant), and en route he stated that he had been "in trouble," that he intended to burn Morris' car because there was blood from Turner's murder all over the back seat, and that he would have to get rid of Morris because he had been a rat in prison. The appellant's response to Fair's stated intentions was to ask what about Fair's apparent girl friend, Nation (who had knowledge of Fair's murder of Turner and who had overheard Fair's intentions), which could be construed as participation not only in concealing Turner's murder but also in the planning for Morris' subsequent murder. Although the appellant didn't get out of his car at the murder scene, he told Land that Fair trusted her and Thomas and, in what could be construed as a threat to protect the conspiracy, warned them not to let Fair down. After having driven Fair to the murder scene in his car with knowledge of his intention to murder Morris to cover up his earlier murder of Turner, the appellant subsequently drove all the participants back home, brought Fair to his residence to bathe after his night of murderous activity, and burned the tires of his own car to prevent its connection with his part in the conspiracy.

The above evidence, when viewed in the light favorable to the verdicts, was amply sufficient to enable any rational trier of facts to find the existence of the offenses of murder (of Morris) and hindering the apprehension of a criminal (Fair) beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The alleged acquittal (not in this record), subsequent to this trial, of Fair in Habersham Superior Court of the charge of murdering Turner, upon which this appellant's conviction for hindering the apprehension of a criminal was based, would not void the appellant's conviction of the latter offense, where there was evidence in the case sub judice which would enable any *rational* trier of fact to find beyond a reasonable doubt that Fair had murdered Turner. Furthermore, there was evidence that the appellant knowingly participated in the destruction of evidence of Morris' murder, which constitutes a

violation of Code Ann. § 26-2503.

2. The trial judge did not abuse his discretion, as contended in enumerated error 1, in overruling the motion to sever the two charges of murder and hindering the apprehension of a criminal. The evidence revealed that the appellant knowingly participated in a plan to attempt to conceal the death, earlier in the evening, of Turner by disposing of the blood-soaked car in which he had been murdered and by killing Morris and possibly the other witnesses in the Turner murder. This plan, and the two counts with which the appellant was charged, constituted both "a series of acts connected together" and "a series of acts constituting parts of a single scheme or plan." See *Haisman v. State,* 242 Ga. 896 (3) (252 SE2d 397) (1979) and cits.

3. It was not error, as contended in enumerated error 2, for the prosecution, during the opening statement to the jury, to write on a chalkboard the names of the participants in the crimes and the state's witnesses expected to be called. The prosecution in its opening statement is permitted to state what it intends to prove. *Pinion v. State,* 225 Ga. 36 (5) (165 SE2d 708) (1969). This was merely a visual aid, as a part of the opening statement, which enabled the jury to better remember the rather numerous cast of characters involved in the trial. The opening statement is not evidence, and the trial judge so instructed the jury.

4. Enumerated error 4 complains of the admission in evidence of detailed testimony as to the murder of Turner, which the appellant contends is irrelevant to the crimes for which he was tried and prejudicial to his defense. This testimony was admitted without objection by defense counsel, hence this issue need not be considered on appeal. Furthermore, this was evidence of a previous crime not by the appellant, but by another or others, and it was relevant to "show a course of conduct pointing toward and leading to the crime, as where there exists in the mind of the actor some connection linking the acts together for a purpose which he intends to accomplish, a method, scheme, or system employed by the defendant, or where the separate acts are acts of co-conspirators, the conspiracy having been proved, ... " *Hodges v. State,* 85 Ga. App. 617, 625 (dissenting opinion) (70 SE2d 48) (1952) and cits. As has already been indicated hereinabove, the evidence authorized a finding that the appellant knowingly participated in a scheme to cover up the Turner murder, thus linking that murder to the charges for which the appellant was tried.

5. Enumerated error 4 is the admission in evidence of two photographs of the deceased, Morris. It is contended that the photographs were irrelevant, immaterial and prejudicial in light of the stipulation that the deceased was Morris. These photographs depicted the extent, nature, and location of the wounds suffered by

the victim, which are material to the issues in a homicide case, and admissible even though cumulative. *Lamb v. State,* 241 Ga. 10 (2) (243 SE2d 59) (1978). This enumeration is without merit.

6. The record supports the trial court's determination that the appellant's in-custody statements were shown to be voluntary by a preponderance of the evidence. That the first statement was made in absence of counsel while the police knew he was represented by counsel, would not alone make such statement inadmissible. *Emmett v. State,* 243 Ga. 550 (8) (255 SE2d 23) (1979) and cits. Enumerated error 7 is without merit.

7. The appellant contends in enumerated error 8 that the trial court erred in overruling his motion for mistrial based upon an alleged violation of an immunity order under Code Ann. § 38-1715 (Ga. L. 1975, pp. 727, 728).

No such immunity order appears in the record on appeal. Even if the certified copy of the order attached to the appellant's brief be accepted as authentic, moreover, there appears no violation thereof. After Officer Attaway had testified as to the content of the appellant's in-custody statements, the prosecutor asked Attaway whether the appellant had testified in Fair's trial to everything the appellant had told Attaway, to which Attaway gave a negative response. Contrary to the appellant's contention, this was not a violation of the purported immunity order, but was an apparent attempt by the state to ensure that the testimony given in the previous trial not be used in the trial sub judice, and was merely a clarification of Attaway's previous response. Furthermore, it appears from the record that defense counsel made the initial inquiry regarding the appellant's testimony at the prior hearing. This enumeration is without merit.

8. The appellant requested the following charge: "I charge you that mere presence and participation in the general transaction in which a homicide is committed is not conclusive evidence of consent and concurrence in the perpetration of the crime by a defendant sought to hold responsible for the homicide as aiding and abetting the actual perpetrator, unless such defendant participated in the felonious design of the persons killing." The appellant contends in enumerated error 9 that the trial judge erred in failing to give this charge verbatim, and in enumerated error 12 that this constituted a failure to charge the appellant's theory of the case.

The trial judge correctly covered the subject matter of this request to charge, including the language of Code Ann. § 26-801, and it need not have been in the exact language requested. *Herrmann v. State,* 235 Ga. 400, 402 (220 SE2d 2) (1975) and cit. These enumerated errors are without merit.

9. The failure to charge on the lesser included offenses of involuntary manslaughter and concealing death, without request, was not error. See *Montgomery v. State,* 241 Ga. 396 (2) (245 SE2d 652) (1978) and cit. Enumerated errors 10 and 11 are without merit.

10. The overruling of the motion for new trial was not error, as contended in enumerated error 13.

*Judgment affirmed. All the Justices concur.*

SUBMITTED MAY 30, 1980 — DECIDED SEPTEMBER 16, 1980 — REHEARING DENIED OCTOBER 7, 1980.

*Bruce S. Harvey,* for appellant.

*Jeff C. Wayne, District Attorney, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Assistant Attorney General,* for appellee.