42698. CARGILL v. THE STATE.
(340 SE2d 891)

MARSHALL, Presiding Justice.

The appellant, David Loomus Cargill, was convicted of two counts of murder and two counts of armed robbery. The evidence

shows that the appellant's brother, Thomas Philip Cargill, was an accomplice to these crimes. The appellant was given the death penalty for the murder convictions. His case is here on direct appeal, for review under the Unified Appeal Procedure (252 Ga. A-13 et seq.) and for the sentence review required by OCGA § 17-10-35. For reasons which follow, we affirm.[1]

The victims, Danny and Cheryl Williams, were a young couple with four male children under the age of ten years. Cheryl Williams worked part-time at the Premium Oil Service Station on River Road in Bibb City. On the evening of Tuesday, January 22, 1985, Danny Williams came to the station to assist his wife after putting their children to bed.

Later in the evening of January 22, the Williamses were found face down in the service station. They were both dead. They had each sustained two bullet wounds in the head. Gunpowder residue indicated that Cheryl Williams had been shot from a distance of less than two feet. Medical testimony further established that both victims had been lying on the floor at the time they were shot. Approximately $482.79 in cash had been taken from the service station, as well as a knife belonging to Danny Williams and valued at $35. The cash formed the basis for one count of armed robbery of which the appellant was convicted, and the knife formed the basis for the other armed-robbery count.

Mr. John McCollum of Opelika, Alabama, testified that he owned a light green, 1969, half-ton pickup truck with a gray right-front fender, and a dog box in the back of the truck. Mr. McCollum testified that this truck had been stolen from him on the evening of Wednesday, January 16, 1985. This truck was seen near the Premium Oil Service Station on the night of the murders. Katherine Sue Brown lives in Phenix City, Alabama, and she is a cousin of Thomas (also known as Tommy) Cargill's wife. She testified that on the weekend prior to January 22, 1985, she had seen Tommy and David Cargill in Phenix City, and they were in possession of a truck, which she identified as the truck belonging to John McCollum. Mr. Hoyt Eugene Ledford is Tommy Cargill's wife's uncle, and Tommy was living at his house in Phenix City at the time of the murders. Mr. Ledford testified that on the day of the murders, David and Tommy Cargill were in possession of a truck fitting the description of John McCollum's

---

[1] The jury returned its verdict as to sentence on July 20, 1985. One of appellant's trial attorneys filed a motion to withdraw as counsel on July 22, 1985, and this motion was granted on July 22. Appellant's other trial attorney filed a motion to withdraw as counsel on July 24, 1985, and this motion was granted on July 24. No motion for new trial was filed. A notice of appeal was filed on September 6, 1985, and the record was docketed in this court on September 20, 1985. This case was orally argued on November 12, 1985.

truck.

Brenda Cargill Mathis and the appellant were married in 1983, and they divorced shortly after the appellant's arrest in this case. At the time of the murders, the appellant was living with her and a child of hers by a previous marriage. She testified that several times she heard the appellant talk about the "big crime" or the "big one" and that he would not leave any witnesses, because, "[d]ead men don't talk." She identified a photograph of John McCollum's truck as being the truck of which the appellant was in possession at the time of the murders. She testified that the appellant had given her various items, which were identified by John McCollum as being items which belonged to him and which were in the truck at the time it was stolen. Other similarly identified items were found in the appellant's apartment.

Brenda Mathis further testified that on the morning of January 22, Tommy Cargill came to her and the appellant's apartment. The appellant told him to come back when it got dark. Tommy left in the truck. Later that evening, Tommy came back. As recounted by Brenda, Tommy then said to the appellant, " 'The girl,' or either, 'the girls are there alone'; that he had just went by there." There was a gun which the appellant had previously given to Brenda for safekeeping, telling her not to leave any fingerprints on it. The appellant took the gun, put it in his pocket, and said to Tommy, " 'Good. Let's go.' "

Brenda testified that, to the best of her recollection, the appellant came back to the apartment between 9:00 and 10:00 o'clock that evening. Although he had not had any money when he left, when he returned he had a large box of Kentucky fried chicken, as well as other food including chocolate pudding. While they were eating, she noticed what appeared to be blood on his shirt sleeve. He looked around the room to see if anyone was watching; he then took some chocolate pudding and rubbed it into the blood. A report concerning the armed robbery later appeared on television. "And David said, he laughed — well, not laughed but 'Aha, they must not have got anything.' " Later that evening, he gave her approximately $150 to $175, and he told her, if anybody asked, to tell them that it was child-support money she had received from her former husband. Later in the week, the appellant and Brenda were watching a news report on television concerning the crimes. Brenda testified, "They said they had witnesses in the murders, and David stood and laughed and said, 'No, there wasn't any witnesses.' "

Patrick Tidwell testified that around 9:00 to 10:00 o'clock on the evening of January 22, he encountered the appellant at the Robert E. Lee Lounge, and he gave the appellant a ride home. En route, he stopped at a Kentucky Fried Chicken restaurant, and the appellant bought "a big family-sized thing of chicken" and some other food.

Tidwell testified that the appellant had a lot of money at the time.

A pistol identified as the murder weapon was found hidden under a dog house in the back yard of Hoyt Ledford's house. It was in a plastic bag, and no fingerprints were found on it. Clinton Layfield testified that he had purchased this gun from Andy Ferguson, and that he, Layfield, in turn sold it to the appellant. When the appellant accepted delivery of the pistol, he indicated that he intended to shoot someone with it.

Travis Allred, who had been the appellant's next-door neighbor, testified that he had had a conversation with the appellant concerning some "easy money." According to Allred, the appellant said, " 'Well, I've been scoping out this place on River Road and I want to rob it and I know where the safe is and everything, but if the people there, you know, identify me that they would — that he would have to kill the people. And I just said, 'O.K.,' you know and walked off from him.' "

Brenda Mathis testified that on the Saturday night after the crimes were committed, she and the appellant went with Richard Whitley to a club called Screamin' Willie's. They stayed until the club closed at 2:00 a.m. On the way back, the appellant said he was tired of Clinton Layfield's "bad mouthing" him. He said it was about his buying a gun from Layfield. They went to Layfield's apartment, and the appellant set it on fire. On the following Monday, a news report came on television in which it was stated that there was believed to be some connection between the fires and the murders. Brenda informed the appellant of this. He said that he was going out to get a cup of coffee, and that was the last time she saw him. She subsequently went to Tommy Cargill's to try to find out where the appellant was. When he would not tell her, she threatened to go to the police. Tommy said, " 'Don't go to the police. It will just make things worse for us. We've got enough on us.' "

Walter Holler testified that he encountered the appellant at Screamin' Willie's on the Saturday night after the murders. He approached the appellant, propped his arm on the appellant's shoulder, and said, "How about it, David?" The appellant responded, " 'Get out of my face. I killed two. One more wouldn't matter.' "

The appellant was subsequently arrested on February 13, 1985, at a motel in Columbus, Georgia. Numerous, heavily armed law-enforcement officers were used to effect the arrest. After being arrested, the appellant was read his *Miranda* rights both before and after being placed in the patrol car. However, he was not interrogated until approximately 40 to 45 minutes after his arrest at police headquarters.

The interrogation was conducted by Columbus Police Department Detectives Rudolph Lovell and Eugene Allmond. The appellant was again read his rights by Detective Allmond, and he indicated that

he understood them. Detective Allmond began the interrogation. He showed the appellant photographs of Danny and Cheryl Williams, both before and after they were murdered. Detective Allmond discussed the stolen Ford pickup truck, the murder weapon, and certain items of clothing which the appellant had been wearing on the night of the murders. Detective Lovell brought Brenda Mathis into the room; he told the appellant what had been related to him; and he asked Brenda Mathis, "Is what I have just said true and do you intend to testify to that in court?" She looked at the appellant and said, "Yes, it's all true and I will testify to it in court."

Detective Allmond told the appellant what the appellant's brother Tommy had said. The appellant responded, "All of you son of a bitches are alike. The only time [he] would've said anything to you is if you beat hell out of him . . . I don't care what you say, I don't know what you're talking about and I'll admit it — I mean I'll deny it to my dying day . . . f— you." At this point, Detective Allmond left the room and Detective Lovell began interrogating the appellant.

Detective Lovell brought a tape recorder into the interrogation room, and he played a taped message from Tommy Cargill to the appellant, which reads as follows:

"Uh, David, this is Tommy. I wanted you to know I didn't want to tell them all this stuff, but I got to thinking about all of it and I've done some serious thinking. Right now, buddy, you're the only hope I got. They've got me charged with it. The only way they can clear me with it is for you to tell them that you done it. I don't know if you'll do that or not, but I'd appreciate it if you would. It's hard for me to ask you to do something like this after I done went and told on you and all, but right now you're the only hope I've got, buddy.

"David, I want you to think about something. I know you don't have a family and all, but I've got a little girl and one day I want to get out and see her; but as it stands, unless you tell them, there ain't no way I'll ever be able to do that, buddy. I don't know if you love your old lady and that little boy or not, but I wouldn't take nothing in the world for mine."

Tommy Cargill was then brought into the interrogation room. He and the appellant talked. The appellant asked Tommy if he had been hurt. Tommy responded, "No, man, they've treated me real nice and no one's laid a hand on me." Tommy apologized to David for what he had told the police. David asked him if they had told him that Richard was dead.[2] He responded that they had. David then asked him if he had told them before or after they told him about Richard. He

---

[2] Richard Whitley was apprehended for an apparently unrelated criminal offense, and he committed suicide while in jail.

responded, "After." Tommy then said, "David, I'm sorry, but I have a little girl and I want to get out of jail some day. If you don't tell them that you shot them, I'm going to the electric chair." At that time, David "teared up." Tommy left.

According to Detective Lovell, David sat there for a while and did not say anything. Finally, he said, "Tommy didn't know what was going to happen at that station." Detective Lovell responded, "You mean Tommy knew there'd be an armed robbery but didn't know people would get killed?" The appellant responded, "Yes, sir." Detective Lovell then said, "Come on, David, I need to hear it from your mouth." The appellant took a deep breath, looked up at the ceiling, and he said, "Tommy didn't shoot those people, I did."

After he made this statement, Detective Lovell asked him to elaborate on it and he said, "No, at this time I'd like to talk with a lawyer." As recounted by Detective Allmond, the appellant also said, "My liver or back or something is hurting. I think I got liver problems and I'd like to go to the hospital."

Other evidence will be reviewed insofar as it is necessary in resolving the issues presented in this appeal.

1. Prior to trial, the appellant filed a motion for preliminary, i.e., commitment, hearing. At a pretrial motion on this hearing, the appellant argued that an attorney from the public defender's office, who had previously represented him, rendered ineffective assistance of counsel in waiving the appellant's right to a commitment hearing. The prosecuting attorney sought to cross-examine the appellant concerning the evidence he would have introduced in his defense at the preliminary hearing to rebut any showing of probable cause by the state. On advice of defense counsel, the appellant invoked his Fifth Amendment right against self-incrimination. The trial judge then denied his motion for a commitment hearing.

" 'This court has held on numerous occasions that after indictment and subsequent conviction the lack of a commitment hearing will not be construed as reversible error. See *Phillips v. Stynchcombe*, 231 Ga. 430 (202 SE2d 26); *Thrash v. Caldwell*, 229 Ga. 585 (193 SE2d 605); *Griffin v. Smith*, 228 Ga. 177 (184 SE2d 459).' *Wynn v. Caldwell*, 231 Ga. 763, 765 (204 SE2d 143) (1974). For a collection of similar holdings see *Douglas v. State*, 132 Ga. App. 694 (209 SE2d 114) (1974). The '. . . purpose of a commitment hearing is simply to determine whether there is probable cause to believe the accused guilty of the crime charged, and if so, to bind him over for indictment by the grand jury. [OCGA § 17-7-23]' *Jackson v. State*, 225 Ga. 39, 42 (165 SE2d 711) (1969)." *State v. Middlebrooks*, 236 Ga. 52, 54 (2) (222 SE2d 343) (1976).

In this case, the grand jury had already returned its indictment against the appellant by the time his motion for a preliminary hearing

had been filed. Accordingly, under *Middlebrooks* and the cases cited therein, the denial of the motion can present no ground for overturning the conviction. In addition, assuming, strictly for the purposes of argument, that the appellant's prior defense counsel was somehow ineffective in waiving the commitment hearing, the appellant has made no showing of harm or prejudice resulting therefrom.

2. The appellant argues that the trial judge erred in denying his motion for recusal of the trial judge on two grounds: First, because Tommy Cargill's trial was scheduled to be held prior to the appellant's and that trial would be presided over by the trial judge;[3] second, the trial judge had presided over the appellant's and Brenda Mathis' divorce proceeding, and the judge had denied a motion filed by the appellant to set aside their divorce decree.[4]

As argued by the state, the appellant's recusal motion was not accompanied by an affidavit; however, even assuming the truth of the facts on which the recusal motion is based, recusal would still not be warranted. For these reasons, the trial judge did not err in denying the motion. *State v. Fleming,* 245 Ga. 700 (1) (267 SE2d 207) (1980).

3. The appellant argues that he was deprived of his constitutional right of self-representation through the trial court's refusal to permit him to serve as co-counsel in his own defense.

Through pretrial motion, the appellant sought to be allowed to personally cross-examine the state's witnesses Brenda Mathis and Tommy Cargill.[5] The trial judge denied this motion, stating that she would, however, afford the appellant ample time to consult with his attorney and write out anything he wanted to ask.

"A criminal defendant has a constitutional right of self-representation which derives from the Sixth Amendment. *Faretta v. California,* 422 U. S. 806 (95 SC 2525, 45 LE2d 562) (1975). Under the Sixth Amendment, it has been held that the assertion of the right to be represented by counsel constitutes a waiver of the Sixth Amendment right of self-representation. [Cits.]" *Burney v. State,* 244 Ga. 33, 35 (2) (257 SE2d 543) (1979). Thus, the Sixth Amendment right does not afford the defendant the hybrid right to simultaneously represent himself and be represented by counsel. *McKaskle v. Wiggins,* 465 U. S. 168 (104 SC 944, 79 LE2d 122, 136) (1984).

"Art. I, Sec. I, Par. IX of the Constitution of Georgia, 1976 . . . , provided that no person could be deprived of the right to defend himself, in person, by attorney, *or both* . . . [However,] Art. I, Sec. I, Par.

---

[3] In fact, the appellant's trial was held before Tommy Cargill's trial.

[4] The prosecuting attorney argued at trial that the appellant sought to have the divorce decree set aside in hopes that it would result in Brenda Mathis' not testifying against him. See Division 24 (a), infra.

[5] Tommy Cargill did not, in fact, testify.

IX, Constitution of Georgia, 1976, has been superseded by Art. I, Sec. I, Par. XII, Constitution of Georgia, 1983, and a person no longer has the right to represent himself and also be represented by an attorney, i.e., the right to act as co-counsel." *Jones v. State*, 171 Ga. App. 184, 185, 186 (2) (319 SE2d 18) (1984).[6]

Accordingly, the trial judge did not err in denying this motion.

4. The appellant argues that the trial court deprived him of his constitutional rights by failing to excuse for cause two venirepersons, Admiral D. Sims, Jr., and Vera M. Bullock, who, during voir dire examination, testified at one point to the effect that they would automatically return a death sentence against a defendant convicted of murder. The appellant also complains of the trial court's curtailment of defense counsel's examination of these venirepersons on this subject.

(a) As to venireperson Sims, the transcript shows that in response to questioning from the trial judge, he testified that he could return a verdict of life imprisonment if the facts and circumstances warranted it, and that he could return a death sentence if he thought the defendant was guilty. Defense counsel then sought to question this venireperson as to whether he would return a death sentence any time it had been proved that the defendant had committed a murder. The trial judge interceded, a bench conference was held, and the trial judge then proceeded to question Sims, and this questioning clearly established that Sims would weigh the facts and circumstances in determining whether to return a death or life sentence against a defendant where the evidence established that the defendant had committed a murder, and that he would not automatically vote for the death penalty once an underlying determination of guilt had been made.

(b) As to venireperson Bullock, she initially testified that she would not recommend a life sentence if the facts and circumstances of the case, together with the instructions of the trial court, warranted it; when the question was reread to her, she responded that she could recommend a life sentence. Defense counsel had no questions of this venireperson.

(c) "The voir dire of [these venirepersons] presents the reverse of the *Witherspoon* question." *Spivey v. State*, 253 Ga. 187, 194 (6d) (319 SE2d 420) (1984). "[T]he trial court did not err by concluding that the 'final distillation' (*Spivey v. State*, [253 Ga. 187 (319 SE2d 420) (1984)]) of their thought processes did not show a disqualifying bias or predisposition to impose a death sentence." *Curry v. State*,

---

[6] Even when a criminal defendant did have the state constitutional right to simultaneous representation by counsel and self-representation, it was still a matter within the discretion of the trial judge as to whether the defendant could personally conduct part or all of the case. *Hiatt v. State*, 144 Ga. App. 298 (6) (240 SE2d 894) (1977) and cits.

255 Ga. 215, 221 (336 SE2d 762) (1985).

(d) The action of the trial judge in directing the questioning of these prospective jurors was proper under Rule 10.1 of the Uniform Rules for the Superior Court. 253 Ga. 799, 823-824 (1985).[7]

5. The appellant argues that the trial court erred in failing to excuse for cause nine venirepersons whose "attitudes, biases, and connections" to this case interfered with their duties as jurors.

(a) Mr. Robert B. Brown testified that although defense counsel "handled my wife's side of our divorce case," it would not affect his verdict. He also testified that he knew Cheryl Williams, but that this would not affect his being a juror.

(b) Carrie H. Pugh testified that the Williamses' children were patients of the doctor for whom she worked. She further testified that she would not know them if she met them on the street. In answer to repeated questions by defense counsel, she testified that the fact that the Williamses' children were patients of the doctor who employed her would not influence her as a juror.

(c) Diane Coddington testified that she is the former wife of a detective who was scheduled to testify in this case. Defense counsel did not question her concerning this; however, in response to questioning by the prosecuting attorney, she stated that this would not affect her ability to judge his credibility — either negatively or positively.

(d) Wynona C. Ghent initially testified that she was prejudiced, based on the stories concerning the appellant that she had heard in the media. However, upon further questioning, she testified, "At this particular moment I believe with all my heart I could be fair. . . ." Upon subsequent questioning by defense counsel, she repeatedly stated that she "absolutely" could base her verdict solely on what she heard in the courtroom.

(e) Elsie O. Matzinger testified that she had "very mixed feelings" about the death penalty but that she believed she could return a sentence of death if the facts and circumstances and court's instructions warranted it. She initially testified, in response to questioning from the prosecuting attorney, that from the news accounts she had heard concerning this case, "it would lead toward being guilty." She then testified, "Well, the seriousness of this trial would tend to make me view the case as unbiased as possible. I mean, there is hardly any

---

[7] This rule provides, in part, "In cases in which the death penalty is sought, the trial judge shall address all *Witherspoon* and reverse-*Witherspoon* questions to prospective jurors individually. Prior to ruling upon any motion to strike a juror under *Witherspoon*, the trial judge shall confer with counsel for the state and for the accused as to any additional inquiries. Failure to object to the court's ruling on whether or not a juror is qualified shall be a waiver of any such objection." 253 Ga. at p. 824.

harsher verdict than the death penalty, and I would take very serious consideration . . . to the best of my ability I would try to [lay aside any predetermined feelings as to guilt or innocence]." When defense counsel asked her whether she could lay aside anything she had heard and be a fair and impartial juror, she responded, "Yes."

(f) Roy J. Browder, in response to questioning by defense counsel, testified that, although he was not sure, he did not think what he had previously heard about the case had "in any way" influenced him. Defense counsel later asked, "[I]n order for the defendant to be acquitted, is he going to have to counter what you have previously read and heard about it?" Mr. Browder responded, "I'd say probably." However, when the trial judge asked him whether he could listen to the evidence and instructions, base his verdict on the evidence, and follow his oath and the instructions, he responded that he could.

(g) Glynn Chesser testified that, although the news accounts concerning the case created the implication that the appellant was guilty, he could listen to the evidence before rendering a final opinion.

(h) At one point in her testimony, Ella Baker did state that since she had not read any news accounts of this case, she could not say "yes or no" whether she had an opinion as to the appellant's guilt or innocence. However, her testimony, viewed as a whole, clearly established that she had no prior opinions as to the appellant's guilt or innocence.

(i) Defense counsel takes exception to Luther McCallister, Jr.'s, statement during voir dire examination that, in his opinion, if a person takes another person's life he should be punished.

(j) It appears that when statutory questions were asked of the entire jury panel on voir dire examination, Jacqulyn E. King stood up when the panel was asked, "Is your mind perfectly impartial between the state and the accused?" OCGA § 15-12-164 (a) (3). However, upon further questioning, she testified that although she was a secretary in the police department, it would "[i]n no way whatsoever" affect her impartiality.

(k) We hold that the trial court did not err in failing to excuse any of these prospective jurors for cause. See *Castell v. State*, 250 Ga. 776 (5) (301 SE2d 234) (1983) and cits.; *Devier v. State*, 253 Ga. 604 (3) (323 SE2d 150) (1984) and cits.

6. The appellant argues that the trial court erred in failing to excuse for cause Kenny L. Renew, who at the time of trial was on active duty with the United States Army serving as a drill sergeant; however, he had previously been a military police officer and would again become one upon completion of his tour of duty as a drill sergeant. The appellant also complains of the trial court's failure to excuse for cause Winston Bradford, who had previously been a law enforcement officer for Cobb County at one time and the City of

Decatur at another, but who was at the time of trial a private security officer for Bank South.

Police officers employed full-time must be excused if challenged for cause in criminal cases. *Hutcheson v. State*, 246 Ga. 13 (1) (268 SE2d 643) (1980). However, it was held in *Wilson v. State*, 250 Ga. 630 (4a) (300 SE2d 640) (1983), that this holding in *Hutcheson* did not apply to reserve police officers, one of whom was a former part-time police officer on inactive reserves and another one of whom was an auxiliary policeman without any responsibility for the investigation of criminal cases. In *Jordan v. State*, 247 Ga. 328 (6) (276 SE2d 224) (1981), it was held that the *Hutcheson* holding was not applicable to a prospective juror who had previously been a Bibb County deputy sheriff.

As pointed out in *Jordan*, for-cause challenges to the poll, i.e., to individual jurors, are of two types: (1) challenges for principal cause, which are based on facts which, if proved, automatically disqualify the juror from serving,[8] and (2) challenges for favor, which are based on admissions of the juror of facts and circumstances raising a suspicion that the juror is actually biased for or against one of the parties. *Jordan v. State*, supra, 247 Ga. at p. 338. The court in *Jordan* recognized that the challenge to the former deputy sheriff there was a challenge for favor, and the court held that on the record it could not be said that the trial judge erred in overruling the challenge.

Here, Mr. Renew was asked whether the fact that he was a military policeman would in any way influence his ability to serve as a juror because City of Columbus police officers would be testifying. He responded, "Not at all." Mr. Bradford testified to the same effect. There is nothing in the record raising any suspicion that these individuals were biased against the appellant. Consequently, the trial court did not err in overruling the challenge.

7. The appellant generally complains of the trial court's limitation on defense counsel's individual questioning of jurors on voir dire examination. We find no abuse of discretion. *Castell v. State*, supra, 250 Ga. at p. 784 (5a) and cits. As held in Division 4, supra, the *Witherspoon* questioning was conducted in accordance with the Uniform Rules for the Superior Courts.

8. The appellant argues that the trial court erred in excusing for cause prospective jurors Mary Y. Allen, Waltraut Mercado, and

---

[8] *Hutcheson* establishes a rule that a challenge to a prospective juror actively employed as a full-time police officer is a challenge for principal cause. At the time of the *Hutcheson* decision, under the statutory law of Georgia, police and other law enforcement officers employed or appointed on a full-time basis, but not part-time or honorary peace officers, were exempt from jury duty, unless such person made a request in writing to be included in the jury box. Former Code Ann. § 59-112 (a) (1). This exemption has since been abolished. OCGA § 15-12-1.

James Griffin in that the opposition they expressed to capital punishment would not have prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions and oath. *Wainwright v. Witt*, 469 U. S. ___ (105 SC 844, 83 LE2d 841) (1985).

After some equivocation, the prospective juror Allen stated definitely that she could not vote for the death penalty regardless of the facts and circumstances of the case. In answering questions as to whether she could vote to impose the death penalty, prospective juror Mercado responded, "I don't know . . . Well, I don't particularly care for it . . . Well, it depends on what the circumstances are, I guess . . . No, I don't think so . . . No." Initially, prospective juror Griffin stated that he did not know whether he could vote to impose the death penalty, but upon further questioning he stated unequivocally that he could not.

The appellant's argument here is without merit.

9. The appellant argues that the trial court erred in refusing to conduct a voir dire examination of prospective juror Holland. The appellant complains that this resulted in the exclusion of a prospective juror favorable to the defense, in that Mr. Holland was known by defense counsel.

Mr. Holland was a member of the panel of potential jurors from which alternate jurors were to be chosen. Mr. Holland did not appear in court at the time voir dire examination of this panel was conducted. After voir dire examination was conducted, Mr. Holland appeared. Rather than question Mr. Holland at that time, the trial judge sent him back to the jury room to be recalled if any additional alternate jurors were needed. None was. And, none of the alternate jurors who were chosen took any part in the deliberations in this case.

In no way did the complained-of action of the trial judge result in any defect in the selection of the panel from which alternate jurors were chosen. See generally *Carter v. State*, 143 Ga. 632 (2) (85 SE 884) (1915); *Derryberry v. Higdon*, 116 Ga. App. 381 (1) (157 SE2d 559) (1967). In addition, the appellant's complaint is moot in view of the fact that no alternate jurors were called upon to serve. *Devier v. State*, supra, 253 Ga. at p. 607 (3b).

10. The appellant argues that the trial court erred in denying his motion for change of venue in that the pretrial publicity rendered a fair trial impossible.

"[U]nder the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Street v. State*, 237 Ga. 307, 311 (1) (227 SE2d 750) (1976).

"Traditionally, a defendant seeking a change of venue on the basis that the setting of the trial is inherently prejudicial relies heavily if not primarily or exclusively on news media reports, particularly newspapers (because they are easier to collect). However, widespread or even adverse publicity is not in itself grounds for a change of venue. *United States v. McNally*, 485 F2d 398, 403 (8th Cir. 1973), cert. denied 415 U. S. 978 (1974); *Mooney v. State*, [243 Ga. 373, 387 (254 SE2d 337) (1979)]. On appeal, the impact of media publicity is evaluated by various factors, such as the size of the community and the extent of media coverage (number of articles and their circulation); whether it related to the discovery of the crime (e.g., facts regarding the victim) or to the apprehension or interrogation of the defendant (and whether any publicized confession was admitted at trial); the prominence and content of the reports (e.g., facts vs. speculation and emotionalism, and the accuracy and admission into evidence of those facts); and the time interval between the publicity and the trial. *Stroble v. California*, 343 U. S. 181, 191-195 (72 SC 599, 96 LE 872) (1952); *Mooney v. State*, supra, 243 Ga. at 385-387; *Brooks v. State*, 244 Ga. 574, 578-581 (261 SE2d 379) (1979)." *Kesler v. State*, 249 Ga. 462, 472 (7) (291 SE2d 497) (1982).

Newspaper articles contained in the record relate mainly to the discovery of the crimes and to facts regarding the victims. The newspaper articles are factual and not inflammatory. There is one article in which the Columbus Police Department did state that the Cargill brothers had made statements implicating themselves. This article was published on February 16, 1985, and the trial began on July 15, 1985.

At the commencement of the trial, the prosecuting attorney did inform the jury that there was a rumor that the murderers had attempted to cut off Cheryl Williams' ring finger. However, he proceeded to inform the jury that this was not true.

Of the prospective jurors undergoing voir dire examination, only 10% were excused for bias based on opinions formed as a result of pretrial publicity. The appellant has not shown that the trial court erred in denying his motion for change of venue.

11. In asking the statutory questions, and in attempting to ascertain any possible prejudice against the appellant as a result of pretrial publicity, the trial judge asked prospective jurors whether they had formed any opinion in regard to the guilt or innocence of the accused. OCGA § 15-12-164 (a) (1). The appellant argues that this constituted a misstatement of law. This argument is clearly without merit.

12. The appellant argues that the *Witherspoon* qualification process results in juries which are violative of the Sixth Amendment requirement that juries be composed of representative cross sections of the community. This argument is without merit. *Mincey v. State*, 251

Ga. 255 (2) (304 SE2d 882) (1983); but see *Grigsby v. Mabry*, 758 F2d 226 (8th Cir. 1985), cert. granted sub nom. *Lockhart v. McCree*, 106 SC 59 (1985). We note also that the appellant failed to present any evidence in support of this contention.

13. The appellant complains of the trial court's refusal to grant defense counsel's request for funds to hire an investigator and a "defense interrogation expert."

The appellant's contention is that an investigator was needed to interview the 76 witnesses appearing on the prosecution's list of witnesses. The trial judge denied this request, stating that the reason she had appointed two attorneys to represent the appellant was to ensure that there existed sufficient manpower to investigate the case. The state points out that the appellant was given a partial list of prosecution witnesses on April 8, 1985, and a complete list two weeks later. The trial did not begin until July 15, 1985.

As to the "defense interrogation expert," the appellant's contention is that such an expert was necessary in order to assist the defense in determining whether the interrogation methods employed by the police in obtaining the confession from the appellant constituted standard police procedure. The appellant argues that where, as here, the voluntariness of a confession is likely to be a significant factor at trial, the defendant must be afforded an expert's assistance on this issue if he cannot afford one. As authority, the appellant relies on *Ake v. Oklahoma*, ___ U. S. ___ (105 SC 1087, 84 LE2d 53) (1985), which, of course, concerns the need of a psychiatrist to assist the defense where the defendant's sanity is likely to be a significant factor in his defense. The appellant has not shown how an expert on police interrogation procedures would provide any meaningful assistance on the question of whether a confession was voluntarily given by the defendant.

"This court has consistently held that the grant or denial of a motion for appointment of expert witnesses for an indigent defendant lies within the sound discretion of the trial court and, absent an abuse of discretion, the court's ruling will be upheld. See, e.g., *High v. State*, 247 Ga. 289 (2) (276 SE2d 5) (1981). We find no abuse of discretion here, . . ." *Wilson v. State*, 250 Ga. 630, supra, 634 (2).

14. The appellant argues that the prosecuting attorney utilized his peremptory challenges in such a way as to amount to purposeful discrimination against blacks and women.

After the trial had begun, defense counsel presented a motion, complaining that the prosecution had used 18% of its peremptory strikes to exclude females from the jury, with 50% of the venire being composed of females; that the prosecution had used 70% of its peremptory strikes to exclude blacks, with blacks composing one third of the jury venire; and that the prosecution had used 60% of its pe-

remptory strikes to exclude black females, with black females composing one sixth of the venire.

However, the appellant presented no evidence to substantiate his argument concerning these ratios. At the time this argument was made, the parties were unaware of the number of blacks, whites, males, and females on the jury. It was later determined that serving on the jury were three white males, four white females, four black males, and one black female.

In order to establish a claim such as the one being asserted here, the defendant must show systematic exclusion of blacks or females from petit juries through the prosecution's use of peremptory challenges. *Blackwell v. State*, 248 Ga. 138 (1) (281 SE2d 599) (1981). Rather than showing any systematic exclusion, the evidence here shows a fair representation of blacks and females on the appellant's petit jury.

15. The trial court did not abuse its discretion in allowing the jury to view the scene of the crime. *State Hwy. Dept. v. Andrus*, 212 Ga. 737 (95 SE2d 781) (1956). In accordance with *Andrus*, the court was careful to instruct the jury that the sole purpose of the view of the scene was to help the jury understand the evidence and that what they might see at the scene was not evidence.

16. The appellant complains of the prosecution's failure to provide the defense with access to state's witnesses.

Under the rule in effect when the list of witnesses was furnished to defense counsel, "[t]he state furnished the appellant with a list of witnesses as provided by [OCGA § 17-7-110]. We have held that this meets the requirement of the statute and that addresses and telephone numbers of witnesses need not be furnished. *McDowell v. State*, 239 Ga. 626 (238 SE2d 415) (1977); *Holsey v. State*, 235 Ga. 270 (219 SE2d 374) (1975); and *Hopkins v. State*, 144 Ga. App. 663 (242 SE2d 325) (1978). We would agree that the better practice would dictate that the state furnish such addresses and telephone numbers along with the list of witnesses if such information is available." *Roberts v. State*, 243 Ga. 604, 606 (4a) (255 SE2d 689) (1979).

Uniform Superior Court Rule 30.3 (effective July 1, 1985) provides, "Upon request of defense counsel, the district attorney shall furnish to defense counsel as an officer of the court, in confidence, the addresses and telephone numbers of the state's witnesses to the extent such are within the knowledge of the district attorney, unless for good cause the judge allows an exception to this requirement, in which event defense counsel shall be afforded an opportunity to interview such witnesses prior to the witness being called to testify." 253 Ga. 853.

The record in this case shows that the prosecution provided the defense with all addresses of witnesses known to the prosecution;

when such addresses were not known, the prosecution provided the defense with whatever information it possessed concerning how the witnesses could be located. We find compliance with the Uniform Rule.

This complaint is without merit.

17. The appellant argues that the trial court's limitation on his cross-examination of various state's witnesses denied him his right to a thorough and sifting cross-examination.

For reasons which follow, we hold that the trial court did not abuse its discretion in placing the complained-of limitations on defense counsel's cross-examination of the state's witnesses. E.g., *Dick v. State*, 246 Ga. 697 (16) (273 SE2d 124) (1980) and cits.

(a) Brenda Mathis testified that, as she recalled, the appellant was in possession of the murder weapon on January 20. Andy Ferguson testified that, as he recalled, he did not sell the pistol until January 21. Brenda Mathis testified that on the night of the murder, the appellant brought home a "box of Kentucky fried chicken." Pat Tidwell testified that the appellant had a "bucket of fried chicken." Clinton Layfield testified that the appellant usually kept a little bit of money. Brenda Mathis testified that it was unusual for the appellant to carry around a large sum of money.

In pointing out the potential discrepancy between Brenda Mathis' testimony and the testimony of the other witnesses, defense counsel repeatedly sought to ask her whether the other witnesses were lying or telling the truth. The prosecuting attorney continually objected, arguing that differences in recollection did not mean that any of the witnesses were intentionally giving false testimony. The trial court sustained these objections.

However, when the prosecuting attorney was cross-examining the appellant, he elicited testimony from him that most of the state's witnesses were lying. Defense counsel interposed no objection to this line of questioning.

We agree that it is improper for counsel to ask a witness whether another witness is lying. It is generally the function of witnesses to testify as to their personal knowledge of relevant facts; it is not the function of witnesses to determine the veracity of other witnesses. Had defense counsel objected to the prosecuting attorney's questions, the objection should have been sustained. The prosecuting attorney did object to defense counsel's questions, and his objections were properly sustained.

(b) In defense counsel's cross-examination of Brenda Mathis, he elicited the fact that the appellant had never actually told her that he committed the murders, that the police had made her take a polygraph test, and that the test indicated she was telling the truth. On redirect, the prosecuting attorney asked the witness whether they had

polygraphed her about the rest of the things she told them, to which she replied "Yes"; she then testified that she had passed the polygraph test as to the remainder of her statement to the police. On recross, defense counsel asked the witness whether she had passed the polygraph test in regard to her statement that the appellant had gotten home between 9:00 p.m. and 9:30 p.m. on the night of the murders. The prosecuting attorney objected, and the objection was sustained.

If there was any error in the sustaining of this objection, it was certainly harmless in view of the fact that the witness had just testified to the effect that she had passed the polygraph test as to all of the things she told the police.

(c) A forensic serologist for the Georgia State Crime Laboratory was testifying that stains on the appellant's clothing tested positive for both human blood and blood of an unknown species of origin. On cross-examination, defense counsel sought to ask the witness whether she had found anything on the items of clothing which would connect the appellant with Cheryl and Danny Williams' case. The trial court sustained the prosecutor's objection to this question. Defense counsel then elicited testimony from the witness that she had found human blood on certain articles of the appellant's clothing, but she could not "type" it; therefore, it could have come from any human being.

We find no error here.

18. The appellant points to various instances during the trial in which he argues that he was denied his constitutional right to confront and cross-examine witnesses testifying against him.

(a) The appellant argues that he was denied his right to confront Phillip Booker as a result of the following: In his opening statement during the guilt/innocence phase of the trial, the prosecuting attorney told the jury that through Phillip Booker the police had found out that the appellant knew that Clinton Layfield had informed the police that he, Layfield, had sold the murder weapon to the appellant. A detective from the Columbus Police Department testified that he had attempted to interview the appellant because of a conversation he had with Phillip Booker. Clinton Layfield testified that Phillip Booker was present when Layfield talked with the appellant about the gun.

Booker did not testify himself,[9] and neither in the prosecuting attorney's opening statement nor in the police detective's or Layfield's testimony was any reference made to the contents of any out-of-court statement made by Booker. Thus, the appellant was not

---

[9] The evidence shows that he was not subpoenaed to testify, because his whereabouts were unknown.

denied his right to confront Booker as a witness testifying against him. See generally Green, Ga. Law of Evidence (2nd ed.), § 217 et seq.

(b) The appellant argues that he was denied his right to confront Richard Whitley. In his opening statement during the guilt/innocence phase, the prosecuting attorney stated that on Saturday night after the murders, the appellant went to a bar on River Road called Screamin' Willie's; that a man named Richard Whitley was with him; and that, "[t]he evidence will show, while we are talking about Richard Whitley, and why he is with these folks, I don't know, but that Whitley was a successful contractor, businessman, relatively wealthy, but that he got involved with these folks according to the best information that we have on discussing some problems that he had with a former wife and that he wanted this former wife killed."

We find no violation of the right of confrontation here. Although we do hold in Division 21 (a), infra, that this statement was improper, we also hold that it did not constitute reversible error.

(c) The appellant argues that in various instances he was denied his right to confront his brother, Tommy Cargill.

I. As previously stated, Brenda Mathis testified that on the night of the murders, she overheard Tommy say to the appellant, " 'The girl,' or either, 'the girls are there alone'; that he just went by there"; she also testified that after the murders she went by Tommy's house, and she told him that if the appellant was not home by Friday she was going to call the police; she testified that Tommy responded, "Don't go to the police. It will just make things worse for us. We've got enough on us."

Under the indicia-of-reliability test enunciated in *Dutton v. Evans*, 400 U. S. 74 (91 SC 210, 27 LE2d 213) (1970), the admission of these hearsay statements on the ground that they constituted declarations of the appellant's co-conspirator during the pendency of the criminal project did not violate the Confrontation Clause. *Castell v. State*, 250 Ga. 776, supra, (1b).

II. The appellant also argues that his confrontation rights were violated by the admission in evidence of Tommy's taped statement, which was played to the appellant prior to his confession.

The trial court admitted this taped statement of Tommy Cargill for the limited purpose of showing part of the totality of the circumstances under which the appellant's confession was made.[10] *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976); *Lee v. State*, 145 Ga. App. 369 (2) (243 SE2d 734) (1978). Even after the admission of a

---

[10] To the extent that Tommy Cargill's statement constituted a confession by him to his and the appellant's participation in the crimes, any *Bruton* error in admitting the confession would be harmless, in any event, in view of the appellant's confession. See *Rachel v. State*, 247 Ga. 130 (4) (274 SE2d 475) (1981) and cits.

confession following a *Jackson-Denno* hearing, "the jury ultimately assesses for itself the weight to be given to the alleged confession, and determines whether or not to put credence in it." *Young v. State*, 149 Ga. App. 78, 80 (3) (253 SE2d 410) (1979).

III. During the sentencing phase, testimony was given by Marsha Cargill Cannon, who is the appellant's sister. On cross-examination, the prosecuting attorney asked her whether Tommy had told her what happened in regard to "who fired those bullets into those people's head[s]." Over hearsay objection, she was allowed to answer the question, and she answered in the negative.

No testimony harmful to the appellant was elicited here.

19. The appellant argues that he was denied his constitutional right to a fair trial when the trial court permitted one of the state's witnesses to testify in spite of a violation of the rule of sequestration.

During his opening statement, the prosecuting attorney stated that the evidence would show that while on patrol, David Abney, a Bibb City police officer, observed two individuals, who would turn out to be the appellant and David Whitley, run and get into a truck in the vicinity of Clinton Layfield's apartment on the night that apartment was burned. Subsequently, the prosecuting attorney informed the trial judge that David Abney had come into the courtroom during the prosecutor's opening statement, and that Abney had been sent to the witness room. Abney later testified as to what had transpired on the evening Layfield's apartment was burned; and although he could identify the truck they were in, he testified that he was unable to identify the two individuals running from the apartment. Defense counsel did not object to Abney's testifying, request any instructions from the trial court concerning the effect of any violation of the rule of sequestration on the witness' testimony, or cross-examine the witness.

"[OCGA § 24-9-61] states the rule of sequestration as follows: 'In all cases either party shall have the right to have the witnesses of the other party examined out of the hearing of each other. The court shall take proper care to effect this object as far as practicable and convenient, but no mere irregularity shall exclude the witness.'" *Jordan v. State*, 247 Ga. 328, supra, 346 (10). "The purpose of the Code section is to prevent witnesses' hearing the evidence given by each other, so that their testimony will not, through conscious design, or unwitting acceptance of suggestion, fall into a pattern of conformity, and to assure the result that the testimony of each witness is his own version of the facts within his knowledge." *General Oglethorpe Hotel Co. v. Lanier*, 99 Ga. App. 401, 402 (2) (108 SE2d 769) (1959).

Here, the witness did not hear the testimony given by another witness. Rather, the witness arguably heard the prosecuting attorney state to the jury what he expected this witness' testimony to show,

although this is far from certain. It is arguable whether this constitutes a violation of the rule. Cf. *General Oglethorpe Hotel Co. v. Lanier*, supra, with *Smith v. State*, 244 Ga. 814 (2) (262 SE2d 116) (1979).[11] In any event, there is no showing whatsoever of any harmful or prejudicial error here. *Smith v. State*, supra. And, since the appellant made no objection at trial, he has waived the point.

20. The appellant complains of the prosecuting attorney's asking leading questions of state's witnesses.

We find that various of the questions complained of by the appellant were not leading; others were not objected to by the appellant; and the trial judge sustained the objections to the leading questions that were objected to by the appellant.

21. The appellant argues that he was denied a fair trial as a result of various instances of prosecutorial misconduct occurring during the prosecution's opening argument to the jury during the guilt/innocence phase, closing argument during the guilt/innocence and sentencing phases, during the prosecution's cross-examination of defense witnesses, and during the prosecution's examination of a state's witness.

(a) OPENING ARGUMENT:

"The opening statement of counsel in outlining his side of the case to the jury should be confined to a summary or recital of such matters of proof only as are admissible under the rules of evidence." *Green v. State*, 172 Ga. 635 (3) (158 SE 285) (1931). In opening a criminal case to a jury preliminary to the introduction of evidence, the prosecutor may state what he expects to prove. *Highfield v. State*, 246 Ga. 478 (3) (272 SE2d 62) (1980); *Jordan v. State*, 78 Ga. App. 879 (6) (52 SE2d 505) (1949).

It was highly improper for the prosecuting attorney to have stated in opening argument that Richard Whitley "got involved with these folks according to the best information we have on discussing some problem he had with a former wife and that he wanted this former wife killed." The implication here was that Whitley got involved with the appellant because he wanted his wife killed. This constituted a reference to an unrelated crime, and it would certainly appear that evidence of this crime would not be admissible in this trial.

In a similar vein, it was improper for the prosecuting attorney to have stated in opening argument that, "[t]hey [police] . . . went over and told the defendant that Tommy had told them . . . that the de-

---

[11] A reading of *General Oglethorpe Hotel Co. v. Lanier*, supra, shows that this case actually held that discussions between counsel for one of the parties and witnesses at trial do not violate the rule of sequestration. However, *Bennett v. State*, 107 Ga. App. 284 (3) (129 SE2d 820) (1963), which was cited approvingly in *Jackson v. State*, 235 Ga. 857 (221 SE2d 605) (1976), and followed in *Smith v. State*, supra, holds that such discussions do not constitute harmful error in the absence of an allegation that the witness was informed of what other witnesses had testified or what the witness was expected to testify.

fendant had shot the folks without any reaction for a long period of time." Such hearsay testimony was never sought to be introduced, and it is highly questionable whether it would be admissible for its nonhearsay aspects, i.e., for some purpose other than proving the truth of the statement or, under any recognized exception to the hearsay rule.

Other statements of the prosecuting attorney in opening argument were also improper, although not to the same degree as the statements previously reviewed. The prosecuting attorney stated in opening argument that a number of witnesses did not come forward until after the appellant's arrest because they were afraid of him. Although this is not at all difficult to believe, no evidence of this was introduced. Similarly improper was the prosecuting attorney's statement that Brenda Mathis was no longer married to the appellant, and that "she filed for divorce and that the same lawyers who are now representing [appellant] in an effort to keep her from testifying filed to set aside her divorce decree after it was already granted."[12] The prosecuting attorney should not make derogatory comments concerning defense counsel's unsuccessful efforts to keep evidence out. See *United States v. Gonzalez*, 488 F2d 833 (2) (2nd Cir. 1973). It is also questionable whether it was proper for the prosecuting attorney to have stated that there were witnesses who were cumulative who would not be presented unless "that becomes an issue and credibility is a factor," and that the prosecution would not "bring in everything that was brought by [Brenda Mathis] to the police."

However, defense counsel objected to none of these arguments; thus, the trial court was not given an opportunity to admonish the prosecuting attorney and give appropriate corrective instructions to the jury. As held in *Jordan v. State*, supra, if defense counsel objects to a statement of the prosecutor, and if the trial court instructs the jury that the remarks of counsel in opening argument are of no probative value, no error is committed where it does not appear that the remarks of the prosecutor were otherwise than in good faith.

However, since this is a death-penalty case, we must still review the improper remarks to see if they resulted in a sentence of death being imposed under the influence of passion, prejudice, or any other arbitrary factor. The holding in *Spivey v. State*, 253 Ga., supra at p. 191 (4), concerning the prosecutor's closing argument at the sentencing phase, is equally applicable to opening argument at the guilt/innocence phase. "[I]t is generally true that '(a) party can not during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later.' *Joyner v. State*, 208 Ga. 435

---

[12] In this regard, see Division 24, infra.

(2) (67 SE2d 221) (1951). Objections to argument ordinarily cannot be raised for the first time after trial. *McAllister v. State*, 231 Ga. 368 (1) (202 SE2d 54) (1973); *Scott v. State*, 229 Ga. 541 (6) (192 SE2d 367) (1972). In a death penalty case, however, we must review the record to determine '(w)hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.' OCGA § 17-10-35 (c) (1). This includes review of closing arguments. *Gilreath v. State*, 247 Ga. 814 (15) (279 SE2d 650) (1981). It does not, however, require that we reverse a death penalty simply because some portion of the closing argument might have been subject to some objection never made. See *Mincey v. State*, [251 Ga. 255 (17b) (304 SE2d 882) (1983)]. Instead, we determine only whether the argument, considered in its entirety, was so prejudicial or offensive, or involved such egregious misconduct on the part of the prosecutor as to require reversal of the death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor. *Conner v. State*, [251 Ga. 113, 123 (303 SE2d 266) (1983)]." *Spivey v. State*, 253 Ga. at p. 191.

The evidence as to the appellant's guilt was overwhelming, and showed that the appellant cold-bloodedly and remorselessly executed two individuals in order to eliminate them as witnesses to an armed robbery. We conclude that the previously reviewed improper remarks on the part of the prosecuting attorney were not so prejudicial, offensive, or egregious as to require a reversal of the death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor.

(b) CLOSING ARGUMENT:

The prosecuting attorney remarked during closing argument in the guilt/innocence phase that the first time that the appellant's account of his conduct on the evening of the crimes was heard by anyone was in the courtroom.

Since the appellant confessed to the crimes during police investigation, this remark is not subject to the objection that it penalized the appellant's assertion of his right to remain silent under *Miranda*. Cf. *Hill v. State*, 250 Ga. 277 (4) (295 SE2d 518) (1982).

(c) The remaining complaints concerning prosecutorial misconduct are either nonmeritorious, or the complaints will be dealt with in other portions of the opinion.

22. The appellant argues that the introduction of the results of a polygraph test performed on state's witness Brenda Mathis denied the appellant his right to a fair trial, to due process, to effective assistance of counsel, and to effective confrontation of witnesses.

As noted in Division 17 (b), supra, the appellant himself opened the door to testimony concerning the polygraph examination. Therefore, he cannot complain of the introduction of evidence concerning

the results thereof.[13]

23. The appellant complains of the state's failure to disclose material favorable to the defense under *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

(a) The defense filed a pretrial motion to discover the personnel records of the police officers who would testify. Defense counsel stated his belief that the police officers testifying would give perjured testimony. When defense counsel could articulate no basis for this belief, the trial court denied the motion "based on insufficiency and also the personnel records would not be material in this case."

The trial court did not err in denying this request. When the defense seeks to discover the personnel files of an investigating law enforcement officer, some showing of need must be made. See *United States v. Pitt*, 717 F2d 1334 (11th Cir. 1983). No such showing was made here.

(b) The appellant also contends that the prosecutor withheld exculpatory evidence concerning another suspect in this case, Mr. Richard Whitley. At a pretrial hearing, the trial judge stated that she had read the police report in camera and that she did not find anything exculpatory. We find no error here.

24. The appellant complains of the prosecution's introduction of evidence concerning his divorce from Brenda Mathis.

(a) During the prosecuting attorney's examination of Brenda Mathis, he asked her:

"Q. Did you file for a divorce from appellant shortly after he was arrested?

"A. Yes.

"Q. After that time was there a motion filed by the defendant —

"MR. SANDERS: We object.

"MR. PULLEN: And these two lawyers for —

"MR. SANDERS: We object.

"THE COURT: Let's see what his objection is.

"MR. SANDERS: We object to that question as being totally irrelevant in these proceedings.

"MR. PULLEN: Your honor, I submit that it is relevant, that this defendant and these two lawyers, these lawyers appointed to represent this defendant —

"MR. SANDERS: This is prejudicial statements and I object to it.

"MR. PULLEN: Filed a motion to set aside that divorce two

---

[13] Upon an express stipulation of the parties that they shall be admissible, the results of a polygraph examination are admissible in evidence. *State v. Chambers*, 240 Ga. 76 (239 SE2d 324) (1977), overruling *Stack v. State*, 234 Ga. 19, 21 (214 SE2d 514) (1975) and cits. See *State v. Chambers*, supra (Jordan, J., dissenting).

days after it became final, and they did it as a part of the representation in this case and they billed this county for that domestic relations work and it is relevant to show that they were trying to keep this man and this woman still married so that the marriage privilege against testifying would remain.

"MR. SANDERS: All right, now. We object and move for a mistrial. There is no marriage privilege against testifying, as the court well knows. That's a prejudicial statement.

"THE COURT: That privilege remains with the witness.[14]

"MR. SANDERS: That is correct. That is a totally false statement of the law that the prosecuting attorney has made to this jury. It's prejudicial. There is no way that that can be erased and we move for a mistrial.

"THE COURT: I'm going to sustain the objection as to it being irrelevant, but I'll deny the motion for a mistrial and ask you to proceed on."

We find no abuse of discretion on the part of the trial court here.

(b) During the prosecuting attorney's cross-examination of the appellant, he asked him whether he loved Brenda Mathis. When he responded that he did not, the prosecuting attorney sought to question him concerning the motion he had filed seeking to set aside the divorce decree, arguing that evidence of this was admissible to impeach the appellant's testimony that he did not love Brenda Mathis. Defense counsel objected, but the trial court ruled that she would allow the prosecuting attorney to pursue this line of questioning for impeachment purposes.

The prosecuting attorney then questioned the appellant, establishing that Brenda Mathis had obtained a divorce from him on the ground that the marriage was irretrievably broken, that subsequent to that time he tried to have that divorce set aside, that he was represented by defense counsel in this case, that he alleged in a motion to set aside that there were genuine prospects for a reconciliation, but that the real reason he wanted to reconcile was "to protect my items that she had."

The trial court erred in allowing this line of questioning. Whether the appellant did or did not love Brenda Mathis was not a material issue in this case; therefore, the prosecuting attorney should not have been allowed to impeach the answer given by the appellant on cross-examination that he did not love his wife.

However, the error in allowing this line of questioning certainly did not rise to the level of a constitutional violation. Consequently, the question for decision is whether or not it is highly probable that

[14] See Green, Ga. Law of Evid. (2nd ed.), § 157 et seq.

the error did not contribute to the verdict. *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976). We conclude that it is.

25. The appellant argues that his character was impermissibly placed in issue in various instances during the trial.

The appellant complains of the introduction of evidence showing that the appellant was in possession of a gun at the time of his arrest. This was not error.

"In *McClung v. State*, 206 Ga. 421, 423, it was said: ' "The flight of the accused, the time when and the place where arrested, the manner of the arrest, how he was armed, and whether he resisted, and all the circumstances connected with the arrest, we consider proper evidence to be submitted to the jury to be weighed by them for what they are worth." *Wayne v. State*, 56 Ga. 113 (5), 119.' " *State v. Luke*, 232 Ga. 815, 816 (209 SE2d 165) (1974).

26. The appellant complains of the introduction in evidence of photographs of the victim which had been taken prior to the commission of the crimes in this case, as well as statements of the prosecuting attorney at various points in argument to the jury that the victims were the parents of four young children.

In opening argument, the prosecutor stated to the jury that the evidence would show that Cheryl Williams was a young woman who worked part-time at the Premium Oil Station on River Road; that her husband, Danny, did not work there, but that either he or Cheryl's father would come to the station in the evenings and assist her; and that, on the evening of the murders, Danny had stayed with their four boys in the afternoon and he had come to the filling station that night after getting the boys ready for bed.

The prosecutor's reference to the victim's family circumstances constituted fair comment on the evidence. Cf. *Williford v. State*, 142 Ga. App. 162 (1) (235 SE2d 625) (1977). See generally 50 ALR3d 8, Propriety and Prejudicial Effect of Prosecutor's Remarks as to Victim's Age, Family Circumstances, or the Like (1973). Defense counsel did not object to these comments. Cf. *Street v. State*, 237 Ga. 307, supra, (7); *Williford v. State*, supra. Nor did defense counsel object to the photographs of the victims, which were in no way gruesome or inflammatory. We find no error.

27. The appellant complains of the introduction in evidence of two photographs of the victims at the scene of the crime; he argues that these photographs were gruesome and irrelevant.

The trial court did not err in admitting these two black and white photographs, which were taken at the scene of the crime and which depicted the victim's wounds. See *Ramey v. State*, 250 Ga. 455 (1) (298 SE2d 503) (1983) and cits.

28. The appellant argues that an inculpatory in-custody statement given by him to the police was involuntarily made and, there-

fore, should have been suppressed.

The evidence as to the circumstances surrounding the appellant's inculpatory statement has been reviewed in the statement of facts. Under these circumstances, we cannot say that the trial court erred in finding that this statement of the appellant was freely and voluntarily given. E.g., *Hance v. State*, 245 Ga. 856 (2) (268 SE2d 339) (1980) and cits.

29. The appellant argues that the trial court erred in denying his motion to suppress evidence consisting of various items of clothing of his which had been given to police by Brenda Mathis, who had taken the clothing from the apartment in which she and the appellant had resided. We find no error.

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (Footnote omitted.) *United States v. Matlock*, 415 U. S. 164, 171 (94 SC 988, 39 LE2d 242) (1974).

30. The appellant argues that various portions of the trial court's instructions to the jury were unconstitutionally burden-shifting.

(a) The appellant complains of the following charge: "Every person is presumed to be of sound mind and discretion, but this presumption may be rebutted. You may infer, if you wish to do so, that the acts of a person of sound mind and discretion are the product of his will and you may infer, if you wish to do so, that a person of sound mind and discretion intends the natural and probable consequences of the act. Whether or not you make any such inference or inferences is a matter solely within the discretion of the jury."

This charge was not unconstitutionally burden-shifting. See *Godfrey v. Francis*, 251 Ga. 652 (3) (308 SE2d 806) (1983).

(b) The appellant also complains of this charge: "[I]f a person shall swear wilfully and knowingly falsely, that witness' testimony shall be disregarded entirely unless corroborated by circumstances of other unimpeached evidence, or other unimpeached evidence."

This charge is based on OCGA § 24-9-85 (b). "In order to make this provision applicable 'it must appear, among other things, that the witness admits, on the trial, that he wilfully and knowingly swore falsely, or the testimony must be such as to render the purpose to falsify manifest.' *Smith v. State*, 74 Ga. App. 777 (2) (41 SE2d 541) (1947)." *Hill v. State*, 159 Ga. App. 489, 490 (2) (283 SE2d 703) (1981).

It is debatable whether this statutory provision was even applicable in this case. However, the trial court's instructing the jury on this provision certainly did not shift any burden of proof to the appellant.

*United States v. Holland*, 526 F2d 284 (5th Cir. 1976), which is cited by the appellant, is distinguishable. In *United States v. Holland*, supra, "[t]he circuit court reversed the conviction, pointing out that the instruction directed the jury that where the testimony of two witnesses conflicted as to any part, the whole of the testimony of one witness must be accepted and the whole of the testimony of the other witness must be rejected. The charge given by the court below is not subject to this attack." *Campbell v. State*, 237 Ga. 76, 80 (226 SE2d 601) (1976) (Hill, J., concurring).

(c) The appellant complains of the following charge on malice: "Malice may be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." This charge is certainly not unconstitutionally burden-shifting. See *Godfrey v. Francis*, supra, and cit. (holding that a charge on malice employing "shall be implied" language is not unconstitutionally burden-shifting).

(d) After instructing the jury that it would be their duty to acquit the defendant if they should entertain a reasonable doubt as to his guilt, the trial court proceeded to charge, "On the other hand, should the jury believe from the entire evidence that the defendant is guilty beyond a reasonable doubt, it would be your duty to convict."

The appellant complains of this charge, citing *United States v. Spock*, 416 F2d 165 (1st Cir. 1969). As held in *Spock*, 416 F2d at pp. 180-181, in a criminal case a court may not order the jury to return a verdict of guilty, no matter how overwhelming the evidence. And, as argued by the appellant, the jury does possess a de facto power of nullification, i.e., a power to acquit the defendant regardless of the strength of the evidence against him. However, it nonetheless is true that if the evidence proves the defendant guilty beyond a reasonable doubt it is the jury's duty to convict. *Felker v. State*, 252 Ga. 351 (13, b) (314 SE2d 621) (1984).

31. There being no evidence to support a charge on either voluntary or involuntary manslaughter, the trial court did not err in refusing to instruct the jury on these lesser included offenses. E.g., *Coles v. State*, 253 Ga. 12 (315 SE2d 655) (1984).

Of course, if there is a written request to charge on a lesser included offense, and if the evidence warrants such a charge, it is error for the trial court to refuse to so charge. *Malone v. State*, 142 Ga. App. 47 (234 SE2d 844) (1977). Cf. *Beck v. Alabama*, 447 U. S. 625 (100 SC 2382, 65 LE2d 392) (1980).

32. The appellant argues that the death penalty must be set aside because there has been no finding that he killed, attempted to kill, or intended that a killing take place or that lethal force be employed, as required by *Enmund v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982).

"*Enmund* holds that the Eighth Amendment forbids the imposition of the death penalty upon a defendant 'who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' We find that under no reasonable interpretation of the evidence in this case was [appellant's] participation in the murder of [the victims] so limited. Unlike *Enmund* — who was not present at the scene of the murder, who did not directly commit either the murder or the felony underlying the felony-murder conviction, and whose only participation in the crime was that he drove the get-away car — [appellant] was an active participant in the events that led to the victim's death." (Footnote omitted.) *Allen v. State*, 253 Ga. 390, 395 (7) (321 SE2d 710) (1984).

Here, the trial court charged the jury, during the sentencing phase, "that the sentence of death shall not and cannot be imposed unless you find beyond a reasonable doubt that the defendant either committed the murder himself or he, himself, attempted to kill the victim, or intended that deadly force be used by another to accomplish the criminal enterprise." However, we have indicated that such an instruction is not constitutionally required under *Enmund, Stevens v. Kemp*, 254 Ga. 228, 231 (n. 1) (327 SE2d 185) (1985), and in a recent decision the United States Supreme Court has so held. *Cabana v. Bullock*, Docket No. 84-1236, decided January 22, 1986. There, the Court held that there is no constitutional requirement that the jury be instructed on, or make an express finding concerning, the *Enmund* requirement that, in order for the defendant to be given the death penalty, he must have killed, attempted to kill, or intended to kill in order for the death penalty to be imposed. As held in *Bullock*, the Eighth-Amendment concept of proportionality, as interpreted in *Enmund*, is satisfied if this determination is made by either state trial or appellate court judges. As previously stated, we hold that the evidence in this case clearly satisfies *Enmund*. We also note that instructing the jury concerning the requirements of *Enmund*, as was done in the present case, is the better practice.

33. The appellant complains of hearsay testimony received at the sentencing phase from Sheriff John Adams of Harris County concerning the appellant's bad reputation in the community for criminal acts and violence.

"During the presentence hearing, the state, subject to notice limitations, is allowed to place the defendant's character in issue through his prior record or other criminal acts. [OCGA §§ 17-10-2, 17-10-30]. A defendant in a capital case stands before the trial court or jury in a presentence trial a convicted felon with no presumption of innocence. All aspects of his crime or crimes, his character and his attitude are admissible, subject to the applicable rules of evidence regarding relia-

bility, to guide the fact finder in determining appropriate sentence. See *Lockett v. Ohio*, 438 U. S. 586 (98 SC 2954, 57 LE2d 973) (1978); *Collier v. State*, [244 Ga. 553 (261 SE2d 364) (1979)]." *Fair v. State*, 245 Ga. 868, 871 (2) (268 SE2d 316) (1980).

"Since character and reputation are synonymous and the only way to prove character is by general repute in the community, hearsay, or collective hearsay, is admissible to prove reputation whenever relevant. Thus, reputation is an exception to the hearsay rule." Agnor, Ga. Evid., § 11-44 (1976).

34. Here, the jury recommended the death penalty as to Count 1 (murder of Cheryl Williams) on the basis of the aggravating circumstance that the offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit, armed robbery. OCGA § 17-10-30 (b) (2).

The appellant argues that the use of armed robbery as an aggravating circumstance supporting imposition of the death penalty does not "genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U. S. 862 (103 SC 2733, 2742-2743, 77 LE2d 235) (1983); *Collins v. Lockhart*, 754 F2d 258, 264 (8th Cir. 1985).

In support of this argument, the appellant refers to statistics discussed in *Enmund v. Florida*, supra, 458 U. S. at p. 800, n. 24, which shows that "only about 0.43% of robberies in the United States in 1980 resulted in homicide." As noted in *Enmund*, these statistics do belie the assertion that "the likelihood of a killing in the course of a robbery [is] so substantial that one should share the blame for the killing if he somehow participated in the felony." 458 U. S. at p. 799. Where, however, as here, one intentionally takes a life during the course of committing an armed robbery, *Enmund* obviously holds that the imposition of the death penalty against the armed robber/murderer is not unconstitutional.

35. The jury recommended imposition of the death penalty as to Count 3 (murder of Danny Williams) on the basis of the aggravating circumstance that the offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit, murder. OCGA § 17-10-30 (b) (2). The appellant argues that since he was sentenced to death for the murder of Cheryl Williams, this murder cannot be used as the aggravating circumstance supporting imposition of the death penalty for another murder. We disagree.

The appellant can be sentenced to death for the murder of Cheryl Williams on the ground that her murder was committed while the appellant was engaged in the commission of armed robbery, and the appellant can also be sentenced to death for the murder of Danny Williams on the ground that his murder was committed while the ap-

pellant was engaged in the commission of Cheryl Williams' murder; the doctrine of "mutually supporting aggravating circumstances" is not applicable here. See *Wilson v. State*, 250 Ga. 630, supra, (9) and cits.

36. The appellant argues that the trial court erred in refusing to allow him to submit as mitigating evidence the fact that, under OCGA § 42-9-39 (c), he would not be eligible for parole for 30 years if he were given consecutive life sentences on the armed-robbery counts as well as the murder counts. The appellant also argues that the trial court erred in failing to so instruct the jury.

"In *Lockett v. Ohio*, 438 U. S. 586 (98 SC 2954, 57 LE2d 973) (1978), the U. S. Supreme Court found that Ohio's three mitigating circumstances were too restrictive to be constitutional. There the court said (438 U. S. at 604): '. . . (W)e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' Conversely, the court stated in a footnote (438 U. S. at 604, n. 12): 'Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " *Franklin v. State*, 245 Ga. 141, 152 (7) (263 SE2d 666) (1980).

OCGA § 17-8-76 (a) and (b) prohibit counsel for either side in a criminal case from arguing to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury because of pardon, parole, or clemency. *Gilreath v. State*, 247 Ga. 814 (15) (279 SE2d 650) (1981). Nor can the trial court mention this subject to the jury. *Tucker v. State*, 244 Ga. 721 (11) (261 SE2d 635) (1979).

Consequently, we find no error.

37. The appellant argues that the form of the verdict submitted to the jury impermissibly tilted the scales of the penalty hearing toward death and that the form contained space for finding aggravating circumstances but contained no space for finding mitigating circumstances.

"Georgia law does not allow the imposition of the death penalty unless the jury finds at least one statutory aggravating circumstance beyond a reasonable doubt, and the jury must be so charged. OCGA § 17-10-30 (c)." *Ross v. State*, 254 Ga. 22, 31 (5d) (326 SE2d 194) (1985). "Under Georgia law, a jury . . . should be instructed to consider mitigating circumstances, *Hawes v. State*, 240 Ga. 327 (9) (240 SE2d 833) (1977), and it should be clearly and explicitly informed that it may recommend a life sentence even if it finds one or more

statutory aggravating circumstances beyond a reasonable doubt, *Fleming v. State*, 240 Ga. 142 (7) (240 SE2d 37) (1977). The charge in this case satisfied these requirements." *Ross v. State*, supra, 254 Ga. at p. 32. Cf. *Morgan v. Zant*, 743 F2d 775 (2-5) (11th Cir. 1984); *Finney v. Zant*, 709 F2d 643 (4) (11th Cir. 1983).

Here, the jury was charged that the sentence of death could not be imposed unless the jury found beyond a reasonable doubt that at least one or more statutory aggravating circumstances exists, and that the jury could set the penalty to be imposed at life imprisonment without the necessity of finding any extenuating or mitigating facts or circumstances, or, "if you see fit to do so for any reason satisfactory to you or without any reason."

The verdict form submitted to the jury first instructed the jury as to the aggravating circumstances under which the prosecution was seeking the death penalty, as well as the fact that the jury had to find the statutory aggravating circumstances beyond a reasonable doubt before a sentence of death could be imposed. The jury was then required to state that it did find beyond a reasonable doubt the aggravating circumstance or circumstances as to each murder, and the jury was required to list the aggravating circumstance or circumstances found. Finally, the jury was provided with a final verdict form which allowed them to impose either a sentence of death or life imprisonment.

The form of the jury verdict was not improper.

38. The appellant argues that the trial court's instructions to the jury on mitigating circumstances were inadequate.

In its charge on mitigating circumstances, the trial court instructed the jury as follows:

"In arriving at this determination [as to punishment], you are authorized to consider all the evidence received here in court in both stages of the proceedings presented by the state and the defendant throughout the trial before you unless the court has instructed you to consider certain evidence introduced by the state for a limited purpose, in which event such evidence shall not be considered by you in determining punishment. You shall consider the facts and circumstances, if any, in extenuation, mitigation, and aggravation of punishment. Mitigating or extenuating facts or circumstances are those which do not constitute a justification or excuse for the offense in question but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame.

"Aggravating circumstances are those which increase the guilt or enormity of the offense or add to its injurious consequences."

"The trial court did not err, as appellant contends, in failing to specifically instruct the jury that 'as to mitigating circumstances (the jury) could consider anything, without limitation or definition.' The

court's instruction conveyed to the jury that its authority to recommend mercy was unlimited and not circumscribed by the court's definition of mitigating circumstances." *Romine v. State*, 251 Ga. 208, 215 (10b) (305 SE2d 93) (1983).

39. The appellant argues that the trial court failed to adequately inform the jury of its option to recommend a sentence of life imprisonment notwithstanding the existence of aggravating circumstances.

The trial court charged the jury:

"You may set the penalty to be imposed at life imprisonment based upon any mitigating or extenuating facts and circumstances; however, it is not required and it is not necessary that you find any extenuating or mitigating facts or circumstances in order for you to return a verdict setting the penalty to be imposed at life imprisonment. In other words, whether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty in this case at life imprisonment.

"Further, if you find from the evidence beyond a reasonable doubt the existence in this case of one or more aggravating circumstances as given you in the charge by the court, then you would be authorized to recommend the imposition of a sentence of death, but you would not be required to do so. If you should find from the evidence in this case beyond a reasonable doubt the existence of one or more aggravating circumstances as given you in charge by the court, you would also be authorized to sentence the defendant to life imprisonment."

"[Appellant's fortieth enumeration of error], in which he contends the trial court erred at the sentencing phase of the trial by charging that, whatever the jury's verdict was, it had to be unanimous, is without merit. 'The instruction given was a correct statement of the law,' *Allen v. State*, 253 Ga. 390, 393 (2) (321 SE2d 710) (1984); and 'the trial court is not required to instruct the jury that lack of unanimity forecloses imposition of the death penalty . . .' *Legare v. State*, 250 Ga. 875, 877 (302 SE2d 351) (1983)." *Parks v. State*, 254 Ga. 403, 416 (14) (330 SE2d 686) (1985).

40. On the basis of the statistical evidence presented in *McCleskey v. Kemp*, 753 F2d 877 (11th Cir. 1985), the appellant argues that the appellant's death sentence was imposed pursuant to a pattern and practice among Georgia prosecutors, courts, and juries of discrimination on grounds of race of the victim, race of the defendant, sex, and poverty.

Contrary to the appellant's argument, the court in *McCleskey v. Kemp*, supra, held that the statistical evidence presented in that case was insufficient to show that Georgia's death-sentencing process operates in an unconstitutional manner. One of the arguments in that case was that the defendant had received the death penalty because he

was black; it should be noted that the defendant here is white.

41. The appellant argues that imposition of the death penalty in this case is disproportionate in light of the appellant's lack of a prior criminal record and his questionable culpability.

As authority, the appellant cites the following cases: *Wright v. State*, 254 Ga. 484 (330 SE2d 358) (1985); *Brown v. State*, 253 Ga. 363 (320 SE2d 539) (1984); *Edgehill v. State*, 253 Ga. 343 (320 SE2d 176) (1984); *Duck v. State*, 250 Ga. 592 (300 SE2d 121) (1983); *Wessner v. State*, 236 Ga. 162 (223 SE2d 141) (1976).

The attorney general cites *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984) and the cases cited therein, arguing that *Ingram* and this case are distinguishable from the cases cited by the appellant in that, in *Ingram* and in this case, the defendants were given death sentences because they murdered potential witnesses during the course of an armed robbery. We agree.

42. (a) The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

(b) The evidence supports the jury's findings of the statutory aggravating circumstances. OCGA § 17-10-35 (c) (2).

(c) The sentence of death is not excessive or disproportionate to the penalty imposed in similar cases (see Appendix), considering both the crime and the defendant.[15]

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 18, 1986 —
RECONSIDERATION DENIED APRIL 1, 1986.

*H. Haywood Turner III*, for appellant.

*William J. Smith, District Attorney, Douglas C. Pullen, Assistant District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Staff Assistant Attorney General*, for appellee.

APPENDIX.

*Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Putnam v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*,

---

[15] The disposition of Tommy Cargill's case is not contained in the record in this case. However, imposition of a life sentence for his participation in the crimes would not result in the death sentence against the appellant being disproportionate to the penalty imposed in a similar case. The evidence shows that the appellant was the trigger man, and that his brother was not aware that the appellant was going to execute the armed-robbery victims.

250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Westbrook v. State*, 242 Ga. 151 (249 SE2d 524) (1978); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State*, 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State*, 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State*, 233 Ga. 117 (210 SE2d 659) (1974).