## 45750. HANCE v. KEMP.
(373 SE2d 184)

SMITH, Justice.

We granted Hance's application for a certificate of probable cause to appeal the superior court's denial of his petition for a writ of habeas corpus. For reasons which follow, we affirm.

Hance exercised his right under *Faretta v. California,* 422 U. S. 806, 834-35 (95 SC 2525, 45 LE2d 562) (1975)[1] to represent himself during his original trial in 1978. Legal counsel was appointed to assist him on a standby basis. His conviction and death sentence were affirmed on direct appeal. *Hance v. State,* 245 Ga. 856 (268 SE2d 339) (1980).

The U. S. District Court for the Middle District of Georgia denied Hance's petition for habeas corpus. On appeal, the Eleventh Circuit Court of Appeals refused to examine Hance's claim that his "stand-by" counsel was ineffective stating: "Hance, by asserting his right to self-representation, had waived his right to counsel." *Hance v. Zant,* 696 F2d 940, 950 (11th Cir. 1983). However, the Eleventh Circuit set aside Hance's death penalty on the grounds that the prosecutor's closing argument rendered the sentencing fundamentally unfair, and that two jurors were improperly excluded in violation of *Witherspoon v. Illinois,* 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

---

[1] In *Faretta,* the United States Supreme Court held that a criminal defendant has a constitutional right to waive his right to counsel and represent himself.

The case returned to the superior court for a resentencing trial. This time, instead of seeking to represent himself alone, Hance persuaded the trial court to allow him to act as co-counsel. Hance again was sentenced to death. *Hance v. State*, 254 Ga. 575 (332 SE2d 287) (1985).

Hance sought habeas corpus relief in the Butts County Superior Court. The court denied relief on all grounds including his challenge to the effectiveness of his resentencing trial counsel. This Court granted his application for a certificate of probable cause to consider whether his claim of ineffective assistance of counsel is controlled by *Mullins v. Lavoie*, 249 Ga. 411 (290 SE2d 472) (1982).[2]

## *The Right To Self-Representation And The Right To Counsel*

1. "[T]he Sixth Amendment right does not afford the defendant the hybrid right to simultaneously represent himself and be represented by counsel. [Cit.]" *Cargill v. State*, 255 Ga. 616, 622 (340 SE2d 891) (1986). As a result of changes in the Georgia Constitution, a criminal defendant in Georgia " 'no longer has the right to represent himself and also be represented by an attorney, i.e., the right to act as co-counsel.' [Cit.]" *Cargill*, supra, 255 Ga. at 623.

Nonetheless, although a defendant may not insist on acting as co-counsel, the trial court may, as here, allow him to do so. In such a case, as when the defendant elects to proceed pro se, the record should reflect that his choice to proceed as co-counsel was "made after the defendant was made aware of his right to counsel and the dangers of proceeding without counsel." *Clarke v. Zant*, 247 Ga. 194, 197 (257 SE2d 49) (1981). See also *Jones v. Wharton*, 253 Ga. 82 (316 SE2d 749) (1984). Here, although Hance was given to understand that if he elected to proceed as co-counsel he could not thereafter complain about the quality of his own performance as counsel, it was stated to him by his attorney with the apparent agreement of the trial judge that his election to act as co-counsel would not waive his right to raise later an ineffective-assistance-of-counsel claim as to his attorney's performance. Moreover, it appears that Hance's claim of ineffectiveness relates primarily to the performance of his attorney before Hance sought to act as co-counsel. Compare *United States v. Fessel*, 531 F2d 1275 (5th Cir. 1976) ("Fessel claimed that the ineffective assistance of counsel *before* he asserted his right of self-representation

---

[2] In *Mullins*, we held:
[W]hen a criminal defendant elects to represent himself, either solely or in conjunction with representation or assistance by an attorney, he will not thereafter be heard to assert a claim of ineffective assistance of counsel with respect to any stage of the proceedings wherein he was counsel.

prevented the preparation and presentation of an adequate defense." *Hance v. Zant,* supra, 696 F2d at 950. On this ground, Fessel's conviction was reversed.) Thus, we conclude that Hance is entitled to a review of the effectiveness of his trial attorney.

## The Evidence At Trial

The facts surrounding Hance's arrest and conviction and the facts of the crimes are set forth in *Hance v. State,* supra, 245 Ga. 856. The evidence presented by the state during the resentencing trial was substantially the same as that presented during the first trial. *Hance v. State,* supra, 254 Ga. 575.

Hance's confessions were read to the jury. They included the following: Late in February 1978 he was propositioned by Gail Jackson in a bar. They left together in his car and Ms. Jackson began to remove her clothing. Hance became angry, stopped his vehicle, and hit Ms. Jackson across the head with a "karate chop." As he pulled her by her arms out of the automobile and into the woods, he heard something pop. Leaving her in the woods, he returned to his car to obtain a jack handle. She was still breathing when he returned. He hit her in the head with the jack handle until she was dead. He began to dig a grave with an entrenching tool; however, fear that he would be noticed prompted him merely to cover the victim with leaves and dirt. He threw the murder weapon across the street and left the scene of the crime. He devised a plan to divert suspicion by placing the blame on the "Forces of Evil." The confessions also indicated that he had killed Irene Thirkield in March 1978 in the same manner after she had propositioned him.

Between March 3, 1978 and April 5, 1978, Hance, who is black, wrote a series of letters on Army stationery to the Columbus, Georgia Chief of Police and one letter to the local newspaper. He claimed to be the "Chairman of the Forces of Evil" and that he and his other white companions in "The Forces of Evil" had kidnapped two black women, Gail Jackson and Irene Thirkield. He threatened to kill the women if the "stocking strangler,"[3] was not apprehended or in the alternative if the "Forces of Evil" did not receive $10,000. The letters announced that one black woman would be abducted every three months and executed until his demands were met. One letter stated that the Military Police would receive a telephone call revealing the location of the body of Gail Jackson. The letter indicated that the body was in bad shape, that one arm was broken, and the cause of death was a sharp blow to the head.

---

[3] An unknown assailant known as the "stocking strangler" had been killing elderly white women in Columbus, Georgia.

Hance called the Military Police, identified himself as the "Chairman of the Forces of Evil," and divulged the location of Ms. Jackson's body.

Medical testimony indicated that the entire face and the front portion of Ms. Jackson's skull had been smashed, and her left elbow was completely dislocated. The trauma to the face and head could have been caused by a jack handle.

Medical testimony also indicated similarities between the circumstances of the deaths of Ms. Jackson and Ms. Thirkield. Both bodies were found in various stages of undress in semi-secluded, wooded areas in the same geographic area. Both women suffered massive head injuries. Ms. Thirkield's head was reduced to a few large bones. The injuries Ms. Thirkield suffered could also have been caused by a jack handle.

Hance told officials where they could find the jack handle he used to kill Ms. Jackson. The entrenching tool that he used to begin digging Ms. Jackson's grave was recovered from his living quarters.

A handwriting examiner testified that the handwriting on a letter received by the police was the same as that of Hance's signature on his military records. Fingerprints taken from a letter matched his right middle finger.

The defense opened its case with the testimony of a clinical psychologist, Lewis R. Liberman, Ph.D. Dr. Liberman testified that Hance suffers from a personality disorder. Since Hance did not "fit exactly" into any of the six or seven different types of personality disorders, Dr. Liberman diagnosed him as atypical. Because of his personality disorder, Hance is egocentric and is incapable of having empathy for others. He has a difficult time admitting he has done something wrong, is impulsive, suffers from poor judgment, and tries to justify his mistakes by explaining them away or trying to blame them on others. Dr. Liberman testified that if Hance could recognize and admit he had done something wrong, it would be a sign of progress.

Hance's First Sergeant in the Army testified that Hance was dependable, trustworthy, and a good soldier. He testified that Hance did not lose his temper easily and was not a violent person, but was under stress because of personal, family, and financial problems. Hance had been drawing extra duty to make more money, but had been barred from reenlistment because of his financial problems.

The warden and assistant warden from the Muscogee County Sheriff's Department and the counselor at the State Prison in Jackson, Georgia all testified that Hance had not caused any problems during his incarceration.

Charles Westcott testified that he had known Hance and his family since Hance was in high school, and had employed them in his

business. He testified that Hance worked for him for five years. He was trusted, dependable, and no problem in the community; he came from a hardworking, church-going family, and everyone liked him. Westcott also testified that Hance's invalid mother was attacked, raped, and subsequently died. Westcott felt that Hance had been rehabilitated, that he was a bright, talented man, and that his life should be spared.

Hance testified that he grew up in a below-poverty-level family. He had always wanted to be in the Marines and after graduation from high school he enlisted in the Marines. He was advancing in the Marines and intended to make it his career. His ex-wife was unhappy with his career choice. In order to save their troubled marriage he left the Marines, after serving four and one-half years, and received an honorable discharge. Within a year he enlisted in the Army. After he found his wife and another man in the bedroom of his home, he divorced her. The financial demands of his wife and child caused him to have serious financial difficulties. He was drawing extra duty in the Army and also taking odd jobs in town to supplement his income, but his financial troubles resulted in his being barred from reenlisting.

He testified that he was sickened when he heard of the attack, rape, and subsequent death of his invalid mother in 1972. The assailant was never apprehended.

Hance stated that he did not know why he killed Ms. Jackson in 1978. He told the jury he "lost all sense of control" and that his "mind flipped." He accepted responsibility for the murder, stated that he had begged God's forgiveness and asked the jury to forgive him. During cross-examination, Hance admitted killing both Ms. Jackson and Ms. Thirkield, and admitted he did not tell the truth in the first trial when he denied killing Ms. Jackson. He stated that in the six years following his first conviction he had grown spiritually and physically and had made peace with God.

### The Evidence At The Habeas Proceeding

The evidence Hance presented to the habeas court consisted mainly of an affidavit from Dr. Ralph Allsopp (a clinical psychologist who examined Hance on September 28, 1987) and affidavits from several of Hance's friends and relatives.

Dr. Allsopp's affidavit stated that he administered a full battery of tests to Hance and relied upon affidavits from family and friends and part of the transcript of Hance's court-martial.[4] He stated it was

---

[4] The appellant was court-martialed and found guilty of the murder of Irene Thirkield. "The conviction was, however, reversed on appeal, and he was not retried." *Hance v. State*, 254 Ga. 575, 577 n. 5. Dr. Liberman testified on behalf of Hance during the court-martial.

his "clinical impression that Mr. Hance suffers from a Personality Disorder with Paranoid, Dependent and Narcissistic features." In addition, it was his "clinical impression that Mr. Hance suffers from Atypical Depression."[5]

Dr. Allsopp's affidavit also included the following information:

> The conflicts Mr. Hance experiences in his relationship with women must be viewed in light of his relationship with women. His mother was seen as being good and kind to Mr. Hance and his sister but at the same time, she was unable to prevent her husband from abusing the children both mentally and physically. At an early age, Mr. Hance experienced incest, and found his father in bed with a prostitute. These conflicts carried over into his own marriage, which ultimately ended because of adultery on the part of his wife.

> Mr. Hance's marked paranoia and feelings of insecurity can perhaps be explained in part by the mental and physical abuse inflicted upon him and his sister by his father. As has already been noted, the more aggressive and assertive features of Mr. Hance's personality and at least a portion of his negative feelings toward women can be explained by his view of the paternal figure.

Dr. Allsopp indicated that men like Hance "excessively utilize a transfer of blame mechanism." He further stated that Hance has

> negative feelings toward women, . . . perceived man-woman relationships as being permeated by feelings of sadness, pain, hostility and homicidal ideation, . . . [and] perceives males as generally being very powerful, [and] as being assertive or aggressive in their stance toward women.

The affidavits of the family and friends generally include information that was given to the jury by Hance and by Charles Westcott. The only affidavit providing considerably more information is that of Blanche Yvonne Boyd, Hance's sister.

Boyd's affidavit states that she and Hance had a very close relationship and that he was a good student. Their mother had to work two jobs to provide food and clothing because their step-father worked irregularly and drank. Both she and Hance helped to earn

---

[5] As noted previously, Dr. Liberman had also diagnosed Hance as having a personality disorder, but because Hance did not "fit exactly" into any of the different types of personality disorders, he diagnosed his personality disorder as atypical.

money when they could. When she was nine and Hance was six, their step-father raped her as Hance watched. The step-father beat and intimidated them both, but she "was beaten more frequently" than he. When Hance was twelve he found his step-father in bed with a prostitute. Hance's ex-wife ran around on him, and on two different occasions she stabbed him with knives. Hance was a devoted and loving father to his child.

Hance's retrial attorney testified that Hance at first insisted their defense should be "I didn't do it." The attorney explained that, with difficulty, he persuaded Hance to agree to another approach:

> The first focus was to see if we could go back in on the sentencing stage and say, "I didn't do it," that's what Mr. Hance wanted to do, and so, I went over the trial transcript from the original trial and his court martial, over and over, and he wanted to go in and try to deny it, and I finally, finally, after having to start preparing in that direction, we were able to convince him to go in the direction of, Let's go ahead and tell them the truth. You've told me the truth and I think you feel this pain, and I think they'll be able to see it, and the remorse, and the repentance, and we want to have some people say some good things about you and we want to be able to use Dr. Liberman, and I was able to get him to go along with that, but he didn't go along with it the first time around.

The attorney explained why he chose Dr. Liberman:

> Dr. Liberman was the only psychiatrist or psychologist out of six or eight folks that had seen him, that was willing to say that he had a — Dr. Liberman was the only guy that would say he had a mental disorder and because of this mental disorder, he had a diminished capacity, and he wasn't rational, and he wasn't in his right mind, he was the only somebody that appeared to us that was willing to try to help us make out this diminished capacity defense. We were going to try to show diminished capacity equals diminished responsibility, equals diminished culpability, hopefully then diminished punishment, and Liberman was the only somebody that I had.

The attorney testified that, despite his inquiries, Hance refused to talk about his family background in detail. Moreover, Hance specifically instructed his attorney to "leave [his family] out of it"; he did not want them involved in the case or called as witnesses. The attorney testified that he "tried to move him away from that posi-

tion," but Hance was "adamant." He explained:

> [I]f I had [gone] against his wishes, I would have so alienated Mr. Hance, in my opinion, that I could never have gotten him to cooperate in what I thought as the only viable defense that he had, and that was to get on the stand and tell the truth. I would have just lost Hance if I had alienated him. . . .

> [I]f I had gone in the direction that he was just adamant and opposed to, the family members coming in and saying whatever nice things they could say about him as he was growing up, I do not believe I could have had Hance get on that stand and tell that jury that truth, I just don't believe I could have accomplished it, and I thought that was our only chance to save him. . . .

> I think I'm aware of my duties as counsel, but I've got to make a judgment . . . do I go find [these family members] against his wishes, alienate him, lose him in order to have them, and I made a decision. I would rather have him; I didn't think I could have it both ways. I was convinced then I couldn't, and I don't know of anything other to tell you.

### Ineffective Assistance Of Counsel

2. Hance contends his counsel at the resentencing trial was ineffective in failing properly to investigate, prepare and present evidence of his mental condition and family background.

(a) The standard for evaluating a claim of ineffectiveness is set forth in *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the

result unreliable.

In evaluating counsel's performance, the "inquiry must be whether counsel's assistance was reasonable considering *all* the circumstances." Id. 466 U. S. at 688. (Emphasis supplied.) "[A]ll the circumstances" include the defendant's own actions, because:

> [A] defendant's Sixth Amendment rights are his alone, and . . . trial counsel, while held to a standard of "reasonable effectiveness," is still only an *assistant* to the defendant and not the master of the defense. *See Faretta v. California*, 422 U. S. 806, 820, 95 SC 2525, 2533, 45 LE2d 562 (1975). Our criminal system allows a defendant the choice of whether he wants to be represented by counsel at trial. *See generally Faretta.* Because we recognize that a defendant must have this broad power to dictate the manner in which he is tried, it follows that, in evaluating strategic choices of trial counsel, we must give great deference to choices which are made under the explicit direction of the client.

*Mulligan v. Kemp*, 771 F2d 1436, 1441 (11th Cir. 1985). It follows that Hance's "actions affect both our analysis of whether [his attorney] was deficient, and whether any deficiencies meet the prejudice standard of *Strickland*." *Thompson v. Wainwright*, 787 F2d 1447, 1450 (11th Cir. 1986).

(b) Hance's attorney did not fail to contact members of Hance's family in Virginia out of mere deference to Hance's wishes. As counsel explained, it was not just a matter of maintaining rapport. Counsel had a client who was "singularly uncooperative" and headstrong, who was "adamant" that his family not be involved; counsel had with great difficulty deflected his client from what counsel perceived to be an unproductive, continued denial of guilt in the face of a conviction on overwhelming evidence. Counsel persuaded Hance to accept the more plausible tack of (1) admitting guilt while expressing remorse, and (2) buttressing his testimony with mitigating testimony from a psychologist and from people who knew him.

We find that counsel's decision not to involve members of Hance's family in Virginia was a reasonable one under the circumstances.

(c) There is no merit to Hance's contention that his trial attorney failed to recognize that Hance's mental condition might be a mitigating factor. Nor do we agree that the trial attorney erred by first requesting an evaluation "at state facilities by state doctors." A defendant must first make a "threshold showing to the trial court" of his need for an independent evaluation, *Ake v. Oklahoma*, 470 U. S. 68,

82-83 (105 SC 1087, 84 LE2d 53) (1985), and a court-ordered evaluation may well establish such a need. See *Lindsey v. State*, 254 Ga. 444, 449 (330 SE2d 563) (1985) (Addendum). Dr. Liberman's testimony may not have been as completely favorable as Hance might have wished for, but the investigation in this respect by Hance's trial attorney was not inadequate, nor was his decision to use Dr. Liberman unreasonable.

(d) Since we do not find deficient attorney performance, it is not necessary that we address the prejudice prong of the *Strickland* test. Nevertheless, we note that the testimony Hance now claims should have been offered is not entirely favorable to him. Dr. Allsopp's evaluation may have offered a plausible contributing factor ("mental and physical abuse inflicted upon him and his sister by his stepfather") for Hance's personality disorder, but his descriptions of Hance's "marked paranoia," "homicidal ideation," aggressiveness and "hostility" would have given the prosecutor further grounds to argue Hance's dangerousness to the jury. Likewise, the testimony of Hance's sister might have indicated that Hance suffered as a child, but since she was the one who was raped, and who was beaten more frequently, it would have indicated that she suffered more. The prosecutor could have responded by arguing that, unlike Hance, she grew up to be a "normal citizen[ ] even though [she] had been subjected to [worse] abuse. . . ." *Elledge v. Dugger*, 823 F2d 1439, 1447 (11th Cir. 1987). All things considered, we find that Hance

> has not demonstrated a reasonable probability that, if adduced at trial, the psychiatric and background evidence presented in his habeas proceeding would have caused the sentencer to conclude "that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, [supra] 466 U. S. at 695. . . .

*Elledge v. Dugger*, supra, 823 F2d at 1448.

### Remaining Errors Enumerated

3. Hance's present attorney, without the knowledge or permission of his resentencing trial counsel, tape-recorded a telephone conversation between them more than a week before the habeas hearing. Hance contends his trial counsel's testimony at the habeas hearing must be disregarded in its entirety pursuant to OCGA § 24-9-85 (b) [6]

---

[6] OCGA § 24-9-85 (b) provides: "If the witness shall willfully and knowingly swear falsely, his testimony shall be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence."

because it contradicted the statements he made on the telephone. Trial counsel *did not* wilfully and knowingly swear falsely and his testimony *was not* such as to make manifest a purpose to falsify. *Cargill v. State*, supra, 255 Ga. 616, 641. The provision is not applicable, and we find no error in Hance's second enumeration of error.

4. Hance contends in his third enumeration of error that the habeas court erred in finding a state procedural default as to certain issues that were timely raised in the trial court but not specifically enumerated as error on direct appeal. He argues that issues timely raised in the trial court are automatically raised by the Unified Appeal Procedure.[7]

This court reviewed the

> resentencing trial pursuant to . . .Rule IV (B) (2) of the Unified Appeal Procedure. . .[and concluded] that the sentence of death is supported by the evidence according to law, and was not imposed under the influence of passion, prejudice or any other arbitrary factor.

*Hance v. State*, supra, 254 Ga. 575, 579.

Our review of the resentencing record in *Hance v. State*, id., indicated that no issue timely raised in the trial court but not specifically enumerated as error on appeal rose to the level of plain error. See *United States v. Fuentes-Coba*, 738 F2d 1191, 1196 (11th Cir. 1984). The habeas court did not err in finding a state procedural bar to enumerations of error numbers 6, 7, 11, 15, 17, and 23.

5. "When conflict of interest is raised in a post-conviction proceeding, the petitioner must show actual conflict which caused his counsel's performance to be adversely affected. [Cit.]" *Wharton v. Thomas*, 256 Ga. 76, 77 (343 SE2d 694) (1986). Hance has shown no actual conflict, and we find no error in the appellant's fourth enumeration of error.

6. Enumerations of error 5, 10, 12, 13, 14, 16, 20, 21, and 22 were previously decided adversely to the appellant by this court.

7. Hance asserts in his eighteenth enumeration of error that the charge on intent given during his original trial was burden shifting under *Francis v. Franklin*, 471 U. S. 307 (105 SC 1965, 85 LE2d 344) (1985).

Hance previously contended this charge was burden shifting

---

[7] Rule IV (B) (2) of the Unified Appeal Procedure provides in pertinent part: "The Supreme Court shall review each of the assertions of error timely raised by the defendant during the proceedings in the trial court regardless of whether or not an assertion of error was presented to the trial court by motion for new trial, and regardless of whether error is enumerated in the Supreme Court." 252 Ga. A-28 (1984).

under *Sandstrom v. Montana*, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979). However, neither the state habeas court nor the Eleventh Circuit Court of Appeals found any merit to this contention. *Hance v. Zant*, 696 F2d, supra at 953. More recently, the Eleventh Circuit held that a charge with identical language, i.e., that intent *"may be inferred* from the proven circumstances or by acts and conduct, or it *may* be presumed when it is the natural and necessary consequences of the act. . ."* Hill v. Kemp*, 833 F2d 927, 930 (11th Cir. 1987), does not violate either *Sandstrom v. Montana*, supra, 442 U. S. 510 or *Francis v. Franklin*, supra, 471 U. S. 307. We find no error.

8. The Eighth Amendment to the United States Constitution prohibits states from inflicting the death penalty upon a prisoner who is insane. *Ford v. Wainwright*, 477 U. S. 399 (106 SC 2595, 91 LE2d 335) (1986). Consideration of the appellant's present sanity is premature because his execution is not imminent. We find no error in the appellant's nineteenth enumeration of error.

9. Hance has submitted numerous pro se briefs to this court. An examination of the pro se briefs and errors enumerated therein do not reveal any errors that should be considered in the interest of justice.

*Judgment affirmed. All the Justices concur.*

Decided October 20, 1988 — Reconsiderations denied November 9, 1988.

*Lenzer & Lenzer, Robert Lenzer, Thomas P. Lenzer,* for appellant.

*Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.