## S90P1667. FERRELL v. THE STATE.
### (401 SE2d 741)

CLARKE, Chief Justice.

This is a death penalty case. The defendant, Eric Lynn Ferrell, was convicted by a jury for the murder of his grandmother and his cousin, and for the offenses of armed robbery and possession of a firearm by a convicted felon. He was given the death penalty for each of the murders. This is his appeal.[1]

1. The defendant spent the night of December 29-30, 1987 at his grandmother's house. He left early that morning. Shortly before noon, another relative stopped by the house and found the bodies of the defendant's grandmother and cousin in a bedroom. Both victims had been shot twice in the head at very close range.

While police officers were at the scene, the defendant returned and tried to enter the house, repeatedly asking "What's happened?" The defendant and other relatives were interviewed at the police station. In the defendant's pockets were four spent rounds of .22 ammunition and over $600 in cash. A search of the defendant's home turned up a .22 caliber revolver. The revolver was identified in a ballistics examination as the murder weapon, and the four shell casings found in the defendant's pocket were determined to have been fired from the murder weapon.

The defendant was unable to account satisfactorily for the money

---

[1] The crime occurred the morning of December 30, 1987. The defendant was formally arrested early the next morning. He was indicted during the January term of 1988, and the case was tried from September 12 through September 17, 1988. A motion for new trial was filed on September 23, 1988. Amendments to the motion were filed, and the motion was heard on January 4, 1989, and April 10-11, 1990. The motion was denied on July 30, 1990. The case was docketed in this court on September 24, 1990, and oral arguments were heard on November 19, 1990.

in his pocket. A substantial amount of money was missing from his grandmother's house. On the day of the murders, the defendant paid past due moneys through his probation officer to avoid having his probation revoked.

The evidence supports the conviction. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first enumeration of error, Ferrell contends the trial court erred by admitting in evidence his four pre-trial statements.[2] He contends that his first two statements were not admissible because he was not advised of his *Miranda* rights beforehand. See *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). He contends his third statement was inadmissible because he was only partially advised of his *Miranda* rights and because it was given after he had been illegally searched. And he contends his fourth statement was inadmissible because it occurred after his 6th Amendment right to counsel had attached and after he had invoked his 6th Amendment right to counsel.

(a) Ferrell arrived at the scene of the crime shortly after 3:00 p.m. on December 30 (the day the crime was committed). Ferrell and other family members were escorted to the police station to be interviewed about the crime. Ferrell was not a suspect at this time. Instead, police suspected this was a revenge-type killing by one or more members of the family of a man murdered by two of Ferrell's uncles a few weeks earlier. This initial suspicion was shared by most members of Ferrell's family, and was consistent with the evidence at the scene: The home had not been ransacked, the police at first did not realize the victims had been robbed, and the victims had been killed execution style by gunshot wounds to the head at very close range.

Ferrell conceded in his testimony that he voluntarily had accompanied the police to the station, and the state's witnesses testified that Ferrell was not under arrest, was not in custody, and could have left during this time if he had chosen to do so.

Ferrell gave a written statement to detective Eunice at 4:00 p.m. He stated he had spent the night with the victims because they had been receiving threatening telephone calls and were afraid to stay alone. He said his grandmother had awakened him at 5:30 a.m., and he had gone home to get ready for work. However, no work was forthcoming, so he had visited his probation officer in another county. He claimed he called his grandmother at 9:00 a.m. and she was still alive. After obtaining this statement, Detective Eunice had no further contact with the defendant.

---

[2] There possibly was a brief fifth statement during the booking process when the defendant was formally arrested, but the state did not try to admit this statement.

By 7:30 p.m., many of the relatives had been interviewed. Lead investigator Lindsey and detective Davis reviewed their statements and decided to talk in more detail to Ferrell, who was still not a suspect, and who could still have left if he had wanted to. At this time, they were trying to pinpoint the time of death, and they attempted to establish specific times and details not fully explored in the initial statements.

Ferrell was asked about the condition of the house when he had left, e.g., were the doors and windows locked? He was asked about the alarm clock in his room, set for 6:00 a.m. Ferrell stated that clock did not work, and that his grandmother had awakened him at 5:45 a.m. The investigators asked him why he was on probation. Ferrell told them, and then volunteered the information that he had been previously arrested for murder. The prior arrest for murder was news to the two interviewing officers, who were unarmed. Detective Davis testified:

> Well, at that point I realized that I was in there interviewing this guy and I didn't know if anyone had ever searched him. I was concerned if he might have a weapon on him. I asked him if he had anything in his pockets. . . .

> [A]s I asked the question, he said, "Nothing, except this money." And as he stood up, I could see there was a big bulge . . . in his right front pocket. He reached his hand into the pocket and pulled the money out.

Davis counted the money, so Ferrell could not later accuse them of taking part of it. Davis asked him where he had got "all that money." Ferrell stated he kept his money on him rather than using a bank, that he already had a couple of hundred dollars, and that a man named Murphy had come by his house that morning (December 30) to pay him $450 for a "roofing job."

Lindsey left and attempted to verify the source of the money. He was unable to locate anyone named "Murphy." Ferrell's mother (with whom Ferrell lived) could not recall anyone coming by the house that morning to give Ferrell a large sum of money. The man for whom Ferrell had planned to work that day was contacted, and he stated that Ferrell had worked very little in the last two weeks, knew beforehand he had no work scheduled that day, and usually had little or no money. The employer stated he often had to buy Ferrell's lunch for him. Lindsey also discovered that Ferrell's grandmother usually kept a large amount of money in her house, but that there was none in the house after her death. Moreover, there was no alarm clock in the grandmother's bedroom. Finally, he learned that Ferrell's uncle (one

of the two arrested for murder a few weeks previously) had left a handgun with Ferrell before turning himself in.

At 11:15 p.m., detectives Mabe and Hall "Mirandized" Ferrell and talked to him again. They told him his employer denied that Ferrell was scheduled to work that day. Ferrell insisted he was going to work when he left his grandmother's house. They told him that according to other witnesses, no one had visited him at his residence that morning. Ferrell was unable to give any information about "Murphy" or where he could be located. Finally, Ferrell stated he could have been mistaken about the alarm clock.

A search warrant was obtained and Ferrell's residence was searched. Three handguns, including the murder weapon, were obtained. Ferrell was formally arrested at 3:45 a.m. During the booking procedure, Ferrell was searched, and four spent rounds fired from the murder weapon were found in his pockets.

The next morning, Ferrell was escorted to a magistrate by detective Dillon to set a date for his committal hearing. According to Dillon, after they returned to jail, Ferrell told him he wanted to give another statement. Ferrell confirmed this in his testimony. Ferrell testified that talking to Dillon was "my suggestion" and "my idea," and that, knowing his right not to talk and to the presence of an attorney, he talked to Dillon freely and voluntarily because he wanted to tell him what he knew about the case. Ferrell was "Mirandized" again, and gave another statement, claiming that, before he left his grandmother's house, two armed men entered, killed both victims, gave Ferrell the money and a gun, and left.

(b) The trial court found that Ferrell was not in custody when he gave his first two statements. The evidence supports this finding. Thus, the court did not err by ruling that these statements were admissible even though Ferrell was not advised of his *Miranda* rights before he gave either of these two statements. *Beckwith v. United States*, 425 U. S. 341 (96 SC 1612, 48 LE2d 1) (1976); *United States v. Long*, 866 F2d 402 (II B) (11th Cir. 1989); *Devier v. State*, 253 Ga. 604 (7) (323 SE2d 150) (1984).

(c) We do not agree that the officers' discovery of money in Ferrell's pocket was the result of an illegal search. In the circumstances, the police were entitled to a limited intrusion to ensure their own safety. What occurred was more limited than a pat-down search for weapons which they could have performed; the defendant was not touched, and after he displayed to the officers the source of the bulge in his pocket, he was not further searched until after he was formally arrested. *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

(d) Ferrell contends the "waiver part of *Miranda* was not read" before the third interview. The record shows that Ferrell's *Miranda*

rights were fully explained to him, and that he read and signed the waiver form. His third statement was properly admitted.

(e) The facts set forth above demonstrate that the search warrant was supported by probable cause.

(f) Assuming, arguendo, that Ferrell's 6th Amendment right to counsel attached when he appeared before a magistrate the morning of December 31, and that he invoked his right to counsel at the hearing (and the record is not clear on this point), there was no violation of Ferrell's right to counsel because Ferrell, himself, initiated the interrogation. *Housel v. State*, 257 Ga. 115, 120-122 (355 SE2d 651) (1987). Compare *Roper v. State*, 258 Ga. 847 (1) (375 SE2d 600) (1989).

3. In his second enumeration of error, Ferrell contends he received ineffective assistance of counsel.

Ferrell was represented by two experienced public defenders, one of whom had spent nine years as a criminal prosecutor. They filed numerous pre-trial motions, investigated the case legally and factually, conducted an extensive voir dire examination of prospective jurors, cross-examined state's witnesses, presented defense witnesses, and delivered substantial closing arguments. The test for effectiveness of Ferrell's trial counsel is set forth in *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984):

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

There is a strong presumption that trial counsel's performance "falls within the wide range of reasonable professional assistance," and that any challenged action by trial counsel " 'might be considered sound trial strategy.' " Id. at 689.

Ferrell attacks virtually every decision made by trial counsel. He complains he was not sufficiently prepared for his *Jackson-Denno* testimony, no handwriting expert was consulted about the genuine-

ness of Ferrell's signature on his written statements, the search warrant was not challenged even though the application was based in part on "hearsay," some state's witnesses were not interviewed, cross-examination of some of the state's witnesses was cursory, expert conclusions were not objected to, etc.

It is not necessary to address specifically and individually each and every one of these numerous instances of challenged trial tactics. It is sufficient to note that "strategic choices [made] after thorough investigation are virtually unchallengeable." *Sullivan v. Fairman*, 819 F2d 1382, 1391 (7th Cir. 1987). The trial court found, and the evidence supports the finding, that trial counsel thoroughly investigated the case and prepared for trial. Ferrell has shown nothing that would demonstrate that his trial attorneys failed to exercise reasonable professional judgment in their handling of the case. See *United States v. Balzano*, 916 F2d 1273 (IV) (7th Cir. 1990).

Ferrell complains about the evidence presented on his behalf at the sentencing phase of the trial. Trial counsel interviewed numerous potential witnesses in mitigation, many of whose names had been furnished by the defendant. Only a very few could say anything favorable on the defendant's behalf, and these testified at the trial. Although we do not find deficient attorney performance, we also note that Ferrell has not since the trial discovered witnesses whose testimony, if presented at the sentencing phase of the trial, in reasonable probability "would have caused the sentencer to conclude 'that the balance of aggravating and mitigating circumstances did not warrant death.' [Cit.]" *Elledge v. Dugger*, 823 F2d 1439, 1448 (11th Cir. 1987).

Ferrell has not shown he was denied effective assistance of counsel. See *Hance v. Kemp*, 258 Ga. 649 (2) (373 SE2d 184) (1988).

4. Ferrell contends the trial court erred by not providing him with "conflict-free" counsel in response to his pre-trial objection to his representation by public defenders. The alleged conflict is that the public defender's office also represented the defendant's two uncles who had committed murder a few weeks before the defendant committed murder.

There was no relationship between the two separate cases of murder, and the defendant's uncles did not testify at, and had no information relevant to, this trial. There was no actual conflict of interest adversely affecting trial counsel's performance in this case. *Wharton v. Thomas*, 256 Ga. 76 (343 SE2d 694) (1986). The trial court did not err in its handling of the defendant's objection to representation by public defenders. *Davis v. State*, 255 Ga. 598 (14) (340 SE2d 869) (1986).

5. The court did not err by instructing the jury that "[m]alice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and ma-

lignant heart." OCGA § 16-5-1 (b); *Isaacs v. State*, 259 Ga. 717 (35) (386 SE2d 316) (1989); *Welch v. State*, 254 Ga. 603 (5) (331 SE2d 573) (1985).

The court's instructions defining the offense of armed robbery were correct as a matter of state law, *Lipham v. State*, 257 Ga. 808, 809, 810 (1) (364 SE2d 840) (1988)[3] and did not shift any burden of proof to the defendant.

The court's instructions on credibility were not erroneous. *Felker v. State*, 252 Ga. 351 (3) (314 SE2d 621) (1984).

Ferrell's fourth enumeration of error is without merit.

6. We find no merit to Ferrell's complaints about the sentencing phase instructions. *Romine v. State*, 251 Ga. 208 (10) (305 SE2d 93) (1983).

7. The court did not err, as Ferrell contends, by failing to charge on theft by taking as a lesser included offense of armed robbery, since Ferrell did not request such an instruction. *King v. State*, 178 Ga. App. 343 (2) (343 SE2d 401) (1986).

8. We find no abuse of discretion in the trial court's rulings on the admissibility of evidence and testimony. *Spencer v. State*, 260 Ga. 640 (8) (398 SE2d 179) (1990); *Brown v. State*, 250 Ga. 862 (5) (301 SE2d 876) (1983). We find no merit to Ferrell's 10th and 11th enumerations of error, complaining of alleged prosecutorial misconduct and improper argument. *Spencer v. State*, supra, (9); *Brooks v. Kemp*, 762 F2d 1383 (11th Cir. 1985).

9. On each count of murder, the jury found as statutory aggravating circumstances that the murders were committed while the offender was engaged in the commission of the offenses of murder and armed robbery. OCGA § 17-10-30 (b) (2). The evidence supports these findings. OCGA § 17-10-35 (c) (2). As to Count 1, the murder of the defendant's grandmother, the jury also found that the murder was outrageously and wantonly vile, horrible or inhuman in that it involved torture and depravity of mind. OCGA § 17-10-30 (b) (7). The state's theory of the evidence is that the defendant killed his cousin while the latter was in bed asleep; that the grandmother was awakened by the noise and went to the cousin's bedroom; that the defendant grabbed her, forced her to the floor, and shot and killed her. The state conceded at trial that the victim was not physically tortured but contends she was psychologically tortured. We cannot agree. While the defendant undeniably committed a heinous offense, for which the death penalty is appropriate based upon the jury's § b (2) findings, the evidence in this case does not show serious psychological abuse. Compare *Phillips v. State*, 250 Ga. 336 (6 c) (297 SE2d 217) (1982)

---

[3] See *Beverly v. Jones*, 854 F2d 412, 416 (11th Cir. 1988).

(finding of serious psychological abuse may be found, e.g., where victim accosted, forcibly transported to another location, taunted with prospect of death and then killed, but not where evidence shows only victim's apprehension of death immediately before fatal wounds inflicted, as latter circumstance is present in almost every murder case); *Rivers v. State*, 250 Ga. 303 (298 SE2d 1) (1982). (Division (8 d) — victim, a 13-year-old boy, was anally sodomized in presence of grandmother before being killed; Division (8 e) — victim, a seven-year-old girl, was taken over a mile from her house to a woodpile where she was murdered. Held: both victims suffered serious psychological abuse).

The evidence does not support the jury's § b (7) finding as to Count 1. *Phillips v. State*, supra at 340. However, the jury's remaining findings of statutory aggravating circumstances were sufficient to allow the jury to consider imposing death sentences on both counts. In making its determination, the jury was entitled to consider all the facts and circumstances of the case, including evidence that the defendant killed his own grandmother and his cousin, execution-style, for a few hundred dollars. We conclude that the jury's § b (7) finding as to Count 1 did not lead to the imposition of death sentences on Counts 1 and 2 under the impermissible influence of passion, prejudice or other arbitrary factors. Compare *Davis v. State*, 255 Ga. 588, 595 (340 SE2d 862) (1986).

10. There is no merit to the defendant's contention that the § b (2) statutory aggravating circumstance fails meaningfully to narrow the class of those eligible for the death penalty, *Ford v. State*, 257 Ga. 461 (1) (360 SE2d 258) (1987); *Cargill v. State*, 255 Ga. 616 (34) (340 SE2d 891) (1986).

11. Ferrell complains that defense counsel's examination was improperly restricted at the sentencing phase of the trial. An examination of the record shows that defense counsel successfully restricted the state's examination, not vice versa. Defense counsel was given as much latitude as he desired.

12. Very early in the pre-trial proceedings, the trial judge met with the attorneys in the case to discuss scheduling of hearings. The court also questioned the defense attorney whether he could be retained and could represent the defendant. He could not, and the trial court thereafter appointed two attorneys to represent the defendant.

Ferrell contends this pre-trial conference was a "critical" stage of the proceedings and his absence denied him his constitutional right to be present at every stage of the trial. In view of the limited scope of the conference, we find no constitutional error. See *Kentucky v. Stincer*, 482 U. S. 730 (III) (107 SC 2658, 96 LE2d 631) (1987); see also *Leroux v. State*, 207 NW2d 589, 600 (Wi. 1973) (a conference in chambers dealing solely with questions of law or preliminary matters

of procedure is not part of the trial in a constitutional sense).

13. There was no abuse of discretion in the court's conduct of the jury voir dire examination, and no error in the court's rulings on the qualifications of the prospective jurors. *Jefferson v. State*, 256 Ga. 821, 824 (2) (353 SE2d 468) (1987); *Curry v. State*, 255 Ga. 215 (2) (336 SE2d 762) (1985).

14. Ferrell contends the trial court denied him a "full and fair hearing" on his motion for new trial when it sustained the state's objection to the admission of a document showing he had been placed on a "suicide watch" after his trial. Ferrell did not and has not shown how such a document would have been relevant to any issue, and we find no merit to this claim of error.

Ferrell also contends that, during this post-trial period, his due-process rights were violated when he was examined by a psychiatrist without notice to counsel. Even if such an examination occurred, however, no harm has resulted, since the examination occurred after trial and the state has not sought to introduce any evidence resulting from such an interview.

15. There is no merit to the defendant's constitutional attacks upon our capital punishment laws.

16. The sentences of death imposed in this case are neither excessive nor disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of death sentences in this case.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Lee v. State*, 258 Ga. 762 (374 SE2d 199) (1988); *Frazier v. State*, 257 Ga. 690 (362 SE2d 351) (1987); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State*, 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State*, 236

Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974).

DECIDED MARCH 15, 1991 —
RECONSIDERATION DENIED MARCH 27, 1991.

*Alice C. Stewart,* for appellant.

*Robert E. Wilson,* District Attorney, *James W. Richter, Desiree Sutton Peagler, Michael McDaniel,* Assistant District Attorneys, *Michael J. Bowers,* Attorney General, *Andrew S. Ree,* for appellee.